412 So.2d 116 (1982)
Steve DYE
v.
KEAN'S d/b/a Red Stick Custom Apparel & Linen Service, et al.
Leslie LANDER
v.
KEAN'S d/b/a Red Stick Custom Apparel & Linen Service, et al.
Nos. 14465, 14466.
Court of Appeal of Louisiana, First Circuit.
March 2, 1982.
Vincent J. Glorioso, Jr., Irving J. Warshauer, Eldon E. Fallon, New Orleans, for plaintiffs-appellants, Steve Dye and Leslie Lander.
Ralph Hillman, Thibodaux, for Steve Dye individually.
Gerard M. Dillon, New Orleans, for defendant-appellee, Kean's d/b/a Red Stick Custom Apparel & Linen Service.
Before CHIASSON, EDWARDS and PONDER, JJ.
CHIASSON, Judge.
Plaintiffs-appellants in these consolidated actions, Steve Dye and Leslie Lander, appeal the judgment of the trial court dismissing their respective suits for damages against defendant-appellee, Kean's d/b/a Red Stick Custom Apparel & Linen Service.
Appellants argue the trial court erred in its findings that the uniforms furnished by defendant, through an agreement with *117 their employer, were not a cause-in-fact of their injuries and that flame retardant uniforms, not furnished by the defendant, would not have protected appellants.
In denying appellants' claims, the trial judge in excellent written reasons has fully and correctly answered the complaints of appellants made in this appeal. We have examined the entire record and conclude that the trial judge's findings of fact are supported by the record and that the applicable law was correctly applied to those facts.
For the reasons assigned by the trial judge in his Reasons for Judgment, a copy of which is attached hereto, marked "Appendix" and made part hereof, the judgments of the trial court in these consolidated suits are affirmed at appellants' costs.
AFFIRMED.

 "APPENDIX"
STEVE DYE 17TH JUDICIAL DISTRICT COURT
VERSUS NUMBER 35689
KEAN'S D/B/A REDSTICK CUSTOM PARISH OF LAFOURCHE
APPAREL & LINEN SERVICE, ET AL
CONSOLIDATED WITH:
LESLIE LANDER STATE OF LOUISIANA
VERSUS NUMBER 35690
KEAN'S D/B/A REDSTICK CUSTOM DIVISION "A"
APPAREL & LINEN SERVICE, ET AL
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 REASONS FOR JUDGMENT
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I. FACTS
In 1974 the American Gulf Shipbuilding Corporation (hereinafter referred to as American) operated a shipyard near the Larose community in the Parish of Lafourche, State of Louisiana. On June 24, 1974, American entered into a lease agreement with Kean's, a commercial partnership doing business under the trade name of Redstick Custom Apparel & Linen Service (hereinafter referred to as Kean's), for work uniforms for its employees. Prior to that time the employees of American were permitted to wear clothing of their own choosing. After this agreement was entered into all employees of American were required to wear the uniforms selected by the management. A portion of the rental cost of these uniforms was deducted from the salaries of the employees.
The management of American selected work uniforms for its employees which were made of 65% polyester and 35% cotton (hereinafter referred to as 65-35). A 100% cotton uniform was not accepted. Flame retardant uniforms were not offered by Kean's nor requested by American at this point in time.
Prior to May of 1975, complaints were received by the management of American from some of their employees indicating that the sparks generated by the welding process would melt through the 65-35 uniform and sting the employees. No burns requiring medical attention were reported and there were no reports that these uniforms burst into flames. American directed correspondence to Kean's to determine whether more suitable and/or fire retardant uniforms were available. Kean's then offered a 100% cotton uniform as an alternative but the use of this uniform was rejected by the management of American. No flame retardant uniforms were offered *118 by Kean's and none were ever used by American.
On March 16, 1976, plaintiff, Leslie Lander, was employed by American as a leaderman of a pipe fitting crew. Plaintiff, Steven Dye, was employed as a pipe fitter in Lander's crew. Richard Gierlinski was employed as Dye's helper in the crew and Jerry Thomassie was the crew's foreman.
On March 16, 1976, Jerry Thomassie directed Lander to proceed to the galley of a vessel under construction in the American yard and clean a pipe threading machine. Lander directed Dye to secure safety solvent and disassemble the machine and clean it. Dye in turn directed Gierlinski to proceed to the paint department and ask someone in the department to provide him with solvent to clean the machine. Dye contends that he specifically directed Gierlinski to secure safety solvent but Gierlinski indicated that he did not recall being directed to get safety solvent, only solvent, but could not state positively that Dye did not say safety solvent. Dye did not inform Gierlinski of the difference between regular solvent and safety solvent, the importance of securing safety solvent, or what action to take if no one was present in the paint department. Gierlinski proceeded to the paint shed but no one was present. On his own initiative, Gierlinski secured a cutoff plastic gallon jug and drew some solvent from a barrel that he found. Gierlinski did not read the label on the barrel and the barrel was not clearly marked. The substance that he drew from the barrel was methyl ethyl keytone (hereinafter referred to as MEK), a highly volatile and flammable solvent and paint thinner. Gierlinski, by his own admission, was not aware of the importance or difference between this type of solvent and safety solvent.
Gierlinski returned to the galley of the vessel under construction and gave the jug of MEK to Lander and Dye who commenced cleaning the pipe threading machine with rags that were dipped in the MEK. Lander was called to the back or rear deck of the vessel and Dye continued cleaning the pipe threader. For at least a portion of the time that Dye was cleaning the machine, Ernest P. Daigle, Sr., a pipe fitter, and Russell J. Adams, a fitter-welder, were in the galley laying out pipe. After Dye completed cleaning the machine, he and Ernest Daigle entered into a conversation for several minutes. Because it was a company policy that no welding would take place in the presence of flammable liquids or gases, Daigle asked both Lander and Dye if it would permissible for Adams to commence some of his tack welding duties. Both Lander and Dye advised Daigle that it was permissible to commence. Dye was holding the container of MEK in his left hand and none of the persons present in the room were aware that the container had MEK. Daigle directed Adams to commence his tacking operations. When Adams struck an arc with his welding rod, sparks were made which ignited the MEK vapor over the liquid MEK in the container in Dye's left hand and/or the MEK vapor which was around Dye at this time. Dye appeared to "go up in a ball of flames" and the 65-35 uniform that he was wearing caught on fire and commenced burning. Dye ran from the galley down a passageway toward the rear deck of the vessel calling for Lander. Lander ran to assist Dye and attempted to put out the burning uniform with his hands and body. Other workers in the area joined in to assist in putting out the burning uniform. Dye received substantial burns from this incident. Lander subsequent to this incident became psychiatrically disabled to perform any work.

II. APPLICABLE LAW
A. ARTICLE 2317
A majority of the present Louisiana Supreme Court has interpreted Article 2317 of the Civil Code to impose strict liability or liability without fault on an owner or custodian of a thing for damages caused by a thing in his custody. This liability is said to arise from the legal relationship to the thing whose defect causes or creates an unreasonable risk of injury to others. Jones v. City of Baton Rouge, 388 So.2d 737 *119 (La.1980); Loescher v. Parr, 324 So.2d 441 (La.1976). The elements of proof for a plaintiff in an Article 2317 case are as follows: (1) the thing which caused the damage was in the care and custody of the defendant; (2) the thing had a vice or defect that created an unreasonable risk of injury to another; (3) the injury was caused by the defect. The only defenses available to a defendant against an Article 2317 claim are (1) victim fault; (2) fault of a third person; and (3) the harm was caused by an irresistable force.
B. ARTICLE 2695
Article 2695 of the Civil Code provides as follows:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
At least two essential elements of a lessor's liability under Article 2695 are that the thing leased had a vice or defect and that the damage or injury to the lessee resulted from or was caused by the vice or defect. Lessee fault is a defense to a lessor under an Article 2695 claim. The majority rule in Louisiana jurisprudence is that Article 2695 applies only in the relationship between the lessor and the lessee. Third persons are not entitled to the provisions of Article 2695 and are required to seek relief under the cause of action established by Article 2315. Weiland v. King, 281 So.2d 688 (La.1973); Albritton v. J. C. Penney Co., Inc., 385 So.2d 549 (La.App. 3rd Cir. 1980); Reed v. Ramsay, 355 So.2d 618 (La. App. 4th Cir. 1978); Jordan v. Palm Apartments, 353 So.2d 1120 (La.App. 4th Cir. 1977). CONTRA: Ward v. Conn, 344 So.2d 60 (La.App. 4th Cir. 1977); Jenkins v. Dixie Rental Tools and Casing Crews, Inc., 283 So.2d 271 (La.App. 1st Cir. 1973).
C. ARTICLE 2315
Under the prevailing duty-risk formula of tort liability for applying Article 2315 of the Civil Code the burden is on a plaintiff to establish the following: (1) the act or omission of the defendant was the cause in fact of the resulting injury to the plaintiff; (2) there was a duty on the part of the defendant to protect the plaintiff from the type of harm he suffered; and (3) a breach of that duty. Straley v. Calongne Drayage and Storage, Inc., 346 So.2d 171 (La.1977); Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); Dore v. Cunningham, 376 So.2d 360 (La.App. 3rd Cir. 1979); Broyles v. Yarbrough, 374 So.2d 705 (La.App. 1st Cir, 1979); Kane v. Braquet, 368 So.2d 1176 (La.App. 3rd Cir, 1979). As pointed out in Albritton v. J. C. Penney Co. Inc., supra, under Article 2315 the owner lessor of a thing has an affirmative duty to exercise reasonable care in maintaining the thing leased in a safe condition and of warning any third person whom he knows or should have known may come in contact with the thing leased of any concealed or hidden defects. In order for a third person-non-lessee to recover from a owner-lessor he must prove that the damages suffered were caused by a defect or vice in the thing owned and/or leased. Not every defect serves as a basis for a claim. The defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Thus, in Straley v. Calongne Drayage and Storage, Inc., supra, at page 175, a case involving injury to a third party-employee of a lessee of the owner defendant, the Louisiana Supreme Court did not discuss liability under Article 2695 but analyzed the legal relations between the parties under Article 2315. The Court pointed out "that for alleged wrongful conduct to be actionable negligence it must first be found to have been a cause in fact of the resulting harm." In Straley the Court found that the design of the equipment in question was defective and created *120 an unreasonable risk of harm to users of the equipment and that there was liability under Article 2315.

III. CAUSE IN FACT
Under any theory of liability discussed in Section II above, an element of proof for a plaintiff is that the alleged defect in the thing was a "cause in fact" of the casualty. The evidence adduced at the trial of the case shows that the alleged defects in the 65-35 uniform were not a cause in fact of the casualty. The fire which engulfed Dye was caused by the striking of the arc with the welding rod by Russell J. Adams, which was done with the consent of Dye and Lander. The sparks generated by the striking of the welding arc ignited the MEK vapors which were above and around the container being held in Dye's left hand and which were on or about the uniform being worn by Dye. The MEK was present in the galley of the vessel at the time in question because the management of American failed to properly mark the barrels containing safety solvent and MEK in the paint department, Richard Gierlinski failed to locate someone from the paint department to secure the proper solvent, and Dye failed to properly advise Gierlinski on how to obtain the proper solvent for cleaning the pipe threading machine.
The testimony of Dr. Joseph A. Moylan, which is accepted by this Court, shows that the cause of the burns sustained by Dye was the ignition of the MEK in and about his clothing causing the clothing to burn, and not the burning characteristics of the material. This opinion is substantiated by the fact that the exposed areas of Dye's body were the most severely burned or at least equally severely burned as the areas under the uniform. (Tr. pp. 569 and 570) Dr. Moylan's opinion is also substantiated by the scientific evidence presented by other experts in this case. A full thickness burn of the skin can occur from an exposure of the skin to a heat of 170 degrees Fahrenheit for one second. (Tr. pp. 568 and 601) The heat generated by burning MEK is approximately 1800 to 1900 degrees Fahrenheit. (Tr. pp. 144, 194, 666, and 667) MEK vapor had obviously permeated Dye's uniform. (Tr. p. 445) Even if Dye had been wearing a uniform made of fire retardant material the heat of ignition of the MEK would have subjected his body to temperatures up to 400 degrees Fahrenheit. (See exhibits D-17, D-22, D-23, and Tr. p. 600) A fire retardant uniform permeated with MEK would not have provided protection for Dye under the facts and circumstances of this case. (Tr. pp. 612, 613, and 616) This is particularly true with reference to the severe burns on Mr. Dye's hands and neck which were not covered by material.
Accordingly, it is the opinion of this Court that the alleged defects in the 65-35 uniform provided by Kean's were not a cause in fact of the fire and subsequent casualties in this case.

IV. DEFECT
Under any theory of liability discussed in Section II above the burden is on a plaintiff to prove that the casualty resulted from a defect in the thing. It is well settled in the law that customary practices may be relevant to determine negligence even though they are not conclusive or controlling in the judicial determination of fault. Guilbeau v. Liberty Mutual Ins. Co., 338 So.2d 600 (La. 1976). The testimony of every professional welder in this case indicates that no welder in the Gulf Coast area of the United States has ever used a fire retardant uniform before or since the casualty in this case to conduct his welding activities. (Tr. pp. 23, 61, 70, 85, 86, 474, 512, and 513) The testimony of Gilbert Karcher of Red Kap Industries, a manufacturer of industrial garments, shows that the 65-35 uniform was suitable for welding and that to his knowledge no flame retardant uniforms which were manufactured by Red Kap Industries are used for welding in the Gulf Coast area. Mr. John Kean, III, testified that none of the customers that his firm supplies with industrial uniforms uses flame retardant uniforms for welding purposes in the Gulf Coast area. None of the experts that testified in this case was aware or had knowledge *121 of the use of flame retardant uniforms for welding purposes in the Gulf Coast area of the United States.
The experiments conducted by George S. Buck, Jr. demonstrated that the 65-35 uniform is suitable for welding and does not burst into flames from welding sparks. (See exhibits D-17, D-18, D-19, and Tr. 591 to 597) The 65-35 blend material used in welding uniforms complies with the Flammable Fabrics Standards of the Federal government. (Tr. pp. 619, 620, and 175) While there was evidence introduced to indicate that welding sparks melted through the 65-35 uniform more readily than they would burn through a 100% cotton uniform, the evidence also indicated that the sparks would burn through both and neither burst into flames or cause significant injury. Even though apparently a majority of welders prefer the 100% untreated cotton uniforms, it appears that the burning characteristics of the 65-35 uniforms are not as hazardous as the 100% cotton uniforms. The spontaneous ignition temperature of cotton is 850 degrees Fahrenheit whereas the spontaneous ignition temperature of polyester is approximately 100 degrees higher. (Tr. pp. 180 and 181) From this it is apparent that a 100% cotton uniform will catch fire at a lower temperature and before a 65-35 uniform. Although polyester releases twice as much heat energy per volume on complete burning, as compared to cotton, polyester only burns 40% to completion and thus produces less heat of burning than cotton. The 65-35 blend produces less heat in burning than either pure cotton or pure polyester. (Tr. pp. 182, 413, and 663 to 665) The heat of burning after-glow of residue left by 100% cotton is 2000 degrees Fahrenheit. (Tr. pp. 666 and 667) It is easier to extinguish a fire in 65-35 than in 100% cotton. (Tr. p. 668) Further, the fire resistant properties of flame retardant materials are rendered ineffective by contamination with volatile liquids such as MEK. (Tr. p. 616) The melting of polyester and the scaffolding effect caused by the burning of 65-35 does not add to the area or depth of a burn. (Tr. pp. 562 to 584) The plaintiffs have introduced no evidence to show that the use of a 65-35 uniform is in violation of any Federal, State, or Local governmental regulations.
Accordingly, it is the opinion of this Court that the plaintiffs have failed to prove that 65-35 uniforms have vices or defects that render them unsuitable for use in normal welding operations.

V. UNDECIDED ISSUES
Because of the rulings of this Court on the issues of cause in fact and defect, it is unnecessary for this Court to pass upon the following issues: (1) what constitutes victim fault? See Rodrigue v. Dixilyn Corporation, 620 F.2d 537 (1980) and Sullivan v. Gulf State Utilities Company, 382 So.2d 184 (La.App. 1st Cir, 1980); (2) was either plaintiff guilty of victim fault?; (3) was either plaintiff guilty of contributory negligence?; (4) is assumption of risk a defense to claims under Articles 2317 and 2695?; (5) did either plaintiff assume the risk of injury in this case?; (6) is the duty of an owner of property leased to another the same of that of one who sells property to another? (See Chappuis v. Sears, Roebuck, & Co., 358 So.2d 926 (La.1978)); (7) in the contemplation of Article 2317 was the "custody" of the leased uniform in the owner-lessor, Redstick, or in the lessee, American, or in the user, Steven Dye, or any combination thereof? (See Cardwell v. Jefferson Rental, 379 So.2d 255 (La.App. 4th Cir. 1979)); (8) was Steven Dye a lessee of the 65-35 uniform?; (9) are third persons entitled to the cause of action under Article 2695?; (10) what is the liability, if any, of the alleged joint tortfeasors who effected settlements with the plaintiffs prior to the trial insofar as this affects a pro-rata reduction of any quantum award?; and (11) what is an appropriate quantum for each plaintiff if there is liability?

VI. CONCLUSION
Because of the above rulings of this Court on the issues of cause and fact and defect, judgment will be rendered in favor of the defendant, Kean's d/b/a Redstick *122 Custom Apparel & Linen Service and against the plaintiffs, Steven Dye and Leslie Lander, dismissing the petitions of the plaintiffs with prejudice at plaintiffs' costs.
Judgment will be rendered accordingly.
 s/ Walter I. Lanier, Jr.
 JUDGE WALTER I. LANIER, JR.
 17th Judicial District Court
 Parish of Lafourche, Division "A"