479 So.2d 386 (1985)
CELL-O-MAR, INC.
v.
Lawrence J. GROS, et al.
No. CA 84 0749.
Court of Appeal of Louisiana, First Circuit.
November 19, 1985.
Writs Denied January 31, 1986.
*388 Charles Hanemann of Henderson, Hanemann & Morris, Houma, for plaintiff and third appellant Cell-O-Mar.
James C. Walker, Jr., of Watkins, Walker & Prejeant, Houma, for defendant and second appellant Quality Industries, Inc.
Risley C. Triche and Daniel J. Nail of Triche, Sterfels & Nail, Napoleonville, for defendant and first appellant Lawrence J. Gros and Mr. and Mrs. Daniel Nail.
Michael R. Sistrunk, New Orleans, for defendant and first appellant Nat. Union Fire Ins. Co.
Stanley E. Loeb, New Orleans, for American Ins. Co., defendant-appellee.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
LANIER, Judge.
This is a suit for damages in tort and contract arising out of the collapse of a leased building during renovations by the lessee. The lessor-owner, Cell-O-Mar, Inc. (Cell-O-Mar), filed suit against the lessee, Lawrence J. Gros, the lessee's insurer, National Union Fire Insurance Company (National), a renovation contractor, Quality Industries, Inc. (Quality), the contractor's insurer, American Insurance Company (American), and an interior designer and her husband, Christine and Daniel Nail.[1] The trial court found no coverage by American and no liability of Mr. and Mrs. Nail. Judgment was rendered in favor of Cell-O-Mar against Gros, Quality and National for $138,343.31. Gros, National and Quality appealed suspensively. Cell-O-Mar appealed devolutively.

FACTS
In 1965, Cell-O-Mar erected a building on property it owned, which had the address of 1900 Canal Boulevard, Thibodaux, Louisiana, and was located in Lafourche and *389 Terrebonne Parishes. The plans for the building were obtained from the local lumber company that furnished the building materials. The building was constructed by a local general contractor. The building had a flat roof and no parapets. The roof was supported by a row of seven centrally located columns. A beam spanning the length of the building rested on top of these columns.
In 1972, a bend was discovered in one of the columns. Cell-O-Mar hired Quality to reinforce the column. (The Quality office is next door to the building.) From 1972 to 1977, the building was leased to Arlen Authement. In 1977, Authement contacted Cell-O-Mar's president, Sam Marcello, about a "spongy condition" on the rear portion of the building's roof. Cell-O-Mar hired Jim Blackmon, a roofing contractor, to inspect the roof. Blackmon found the roof dry and in sound condition. The building withstood a number of storms without incident between 1965 and 1978.
On February 13, 1978, Gros executed a written agreement with Cell-O-Mar for the lease of the building and the property on which it was located. The primary term of the lease was from February 14, 1978, to March 27, 1983, with an option to renew for five years. The rent during the primary term was $1,850 per month. The agreement provided that the "premises shall be used primarily to conduct the business of a nightclub". The agreement stated that Gros could not "make any alterations and/or improvements to the leased premises without first obtaining the written consent" of Cell-O-Mar, and any such improvements and/or alterations "shall be done at the sole cost, expense and responsibility" of Gros. In addition, the parties agreed as follows:
Lessee acknowledges that said premises are in good condition and Lessee expressly assumes the responsibility for the condition of the leased premises and Lessor shall not be held liable in damages for any injury to any tenant, employee of Lessee, occupant or any other person or property in the building or on the premises, caused by any vice or defect or change of conditions in the leased premises unless the Lessor be notified in writing of such vice or defect and shall have failed to remedy same within a reasonable time if such defect involved a repair for which Lessor is responsible under the terms of this lease and Lessee assumes full responsibility and liability for and binds himself to hold Lessor harmless from any injury and/or damage to any and all persons and/or property on the leased premises or adjacent thereto, caused by the negligence of Lessee, his employees, agents and/or otherwise and/or caused by Lessee's failure to keep said premises in good condition and/or make repairs for which Lessee is responsible under this lease and Lessee agrees to hold Lessor harmless from any and all such claims and/or damages including the payment of any judgment and/or attorney's fee and/or costs of defending any such suit.
Gros verbally advised Sam Marcello that renovations would be necessary to convert the building into a disco nightclub. However, contrary to the lease provisions, Gros commenced renovations without the written consent of Cell-O-Mar. Gros did not recall whether or not he gave a copy of his renovation plans to Cell-O-Mar. Sam Marcello testified he did not see the renovation plans until he saw them on the floor of the building long after the renovations were under way. After Marcello saw the plans, he asked Gros about them. Gros told Marcello he would have any structural problems resolved by a structural engineer.
Gros retained Christine Nail, an interior decorator, to help with the renovations. Mrs. Nail was not an engineer or an architect. Gros advised Mrs. Nail he wanted a bandstand with an unimpeded view. After the location of the bandstand was selected, Mrs. Nail determined that column 7 (closest to the rear of the building) had to be removed for an unimpeded view. To replace column 7, Mrs. Nail proposed flanking columns spanned by an I-beam. This plan was submitted to show the desired aesthetic *390 effect; it was not offered as an alternative to plans by an architect or structural engineer. Mrs. Nail advised Gros to get a structural engineer to plan the removal of column 7.
Gros commenced renovations without the advice of a structural engineer. Three air-conditioning units weighing a total of 5,100 pounds were placed on the roof. Holes were cut in the roof to accommodate the placement of these units.
Gros subsequently had an employee of his air-conditioning contractor cut the bottom of column 7 with a cutting torch. No provision was made for additional support for the roof. When the column was cut, the roof dropped to fill the void caused by the cutting. Gros then contacted Quality to assist in replacing column 7 in accordance with Mrs. Nail's plan. Clyde Waguespack of Quality supervised Quality's work. Waguespack was not a structural engineer or an architect. Quality selected and furnished materials and selected techniques.
Quality reinforced columns 1 through 6 by welding steel plates to them. Quality installed a temporary column in the vicinity of column 7 and jacked up the center beam to the desired elevation. Quality then procured and installed two flanking columns made of schedule 40 pipe 3½ inches in diameter. Quality procured and installed an 8 inch I-beam perpendicular to the center beam between the flanking columns. When Quality lowered the roof jack after this work was done, the roof sagged an inch. Waguespack had the center beam jacked back up to its former position.
Quality then procured a channel beam and welded it to the I-beam as a stiffener. The jack was lowered and the roof sagged again. The center beam was jacked back up again. Quality procured a flat bar and knee braces, welded the knee braces to the flat bar and welded the flat bar and the knee braces to the I-beam. The jack was again lowered and the roof did not sag. Although the record is not clear, it appears this work was completed on or about June 21, 1978.
On July 5, 1978, heavy rains came. Water leaked into the rear of the building and the interior was awash. The I-beam deflected downward. Quality was contacted to install a temporary column to brace the I-beam. However, before Quality could take action, the I-beam collapsed causing the flanking columns, center beam, bar joists, upper wall and roof to collapse.

LIABILITY OF GROS
Gros contends the trial court committed error by finding him liable.
The lessee of property is bound to enjoy the leased thing as a good administrator. La.C.C. art. 2710. A lessee is liable for injuries and losses caused by his fault. La. C.C. arts. 2721, 2315 and 3556(13); Bell v. Badger Dredging, Inc., 420 So.2d 1197 (La. App. 5th Cir. 1982). Further, Gros contractually obligated himself to Cell-O-Mar to be responsible "for the condition of the leased premises" during the term of the lease and to be responsible for any improvements and/or alterations done to the premises by him.[2] Thus, Cell-O-Mar's claim against Gros sounds in tort and contract.
The trial court found as fact that Gros was at fault by (1) not securing a structural engineer to plan the removal of column 7 and its replacement with new structural supports, and (2) not testing to see if the renovated roof support system would hold the weight of rainwater. Cf. Trahan v. Broussard, 399 So.2d 782 (La. App. 3rd Cir.1981). These factual findings are not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Gros also contends that "the fault of Quality was an intervening cause which would prevent a finding of liability on the part of Gros whose negligence was more remote". Gros contractually obligated himself to Cell-O-Mar to be responsible for *391 the leased premises during the term of the lease and to be responsible for alterations to the premises. These contractual obligations cannot be affected unilaterally by Gros. These contractual obligations are not affected by Quality's conduct because Quality was acting at the request of Gros.
This assignment of error is without merit.

LIABILITY OF QUALITY
Quality contends the trial court erred in finding it liable. Quality asserts Cell-O-Mar did not prove (1) what standard of care (duty) a contract welder must comply with, (2) show a breach of that standard, or (3) show a breach of duty caused the damage. Quality also asserts the trial court erred by holding it to the standard of care expected of a structural engineer.
The agreement between Quality and Gros for the removal of column 7 and restructuring of a portion of the roof support system is a lease of labor and industry for work by the job. La.C.C. arts. 2745(3), 2756 and 2757. Such agreements are commonly called building or construction contracts. See, for example, Martin v. AAA Brick Company, Inc., 386 So.2d 987 (La. App. 3rd Cir.1980). The contractor (builder) in such an agreement has an implied duty to perform in a workmanlike manner free from defects attributable to either faulty materials or poor workmanship. La. C.C. art. 2769; Davidge v. H & H Construction Company, 432 So.2d 393 (La. App. 1st Cir. 1983); Merrydale Glass Works Incorporated v. Merriam, 349 So.2d 1315 (La.App. 1st Cir.1977), writ denied, 350 So.2d 1211 (La. 1977). The contractor is liable for damages if it is shown that he did not possess the necessary skill, efficiency or knowledge, or did not exercise ordinary care in the performance of the work or in the selection of suitable materials and equipment. Tiger Well Service, Inc. v. Kimball Production Company, 343 So.2d 1153 (La.App. 3rd Cir.1977). A contractor is not liable for the destruction, deterioration or defects of a thing he builds if the destruction, deterioration or defects resulted from plans and/or specifications furnished to him that he was obliged to follow. La.R.S. 9:2771; LeBreton v. Brown, 277 So.2d 645 (La.1973); City of Covington v. Heard, 428 So.2d 1132 (La. App. 1st Cir.1983). However, even though a contractor is required to follow plans and/or specifications furnished to him, he can still be liable for damages if the destruction, deterioration or defects were his fault and not related to the plans and/or specifications, or if he had a justifiable reason to believe that adherence to the plans and/or specifications would create a hazardous condition. C-B Construction Company, Inc. v. Kilpatrick, 366 So.2d 990 (La.App. 1st Cir.1979); Ortego v. State Bank & Trust Company of Golden Meadow, 316 So.2d 826 (La.App. 1st Cir.1975), writ denied, 320 So.2d 914 (La.1975). Although these principles are applicable to the third party claim in contract by Gros against Quality, they are also applicable to the Cell-O-Mar cause of action as owner and third party beneficiary of the Gros-Quality contract. State ex rel. Guste v. Simoni, Heck & Associates, 331 So.2d 478 (La.1976). In addition, Cell-O-Mar as a third party has a cause of action in tort against Quality. Marine Insurance Company v. Strecker, 234 La. 522, 100 So.2d 493 (1957); Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3rd Cir.1980). Cf. Oller v. Sharp Electric, Inc., 451 So.2d 1235 (La. App. 4th Cir.1984), writ denied, 457 So.2d 1194 (La.1984).
The trial court found as fact "the building was sound before the structural alterations, and had more than ample strength to support the dead load and all live loads which could reasonably be expected" and that the failure of the I-beam (composite beam) caused the roof to fall. The trial court determined Quality was at fault because it "failed to understand ... the structural integrity of the building was at stake." After reviewing all pertinent evidence, we cannot conclude these factual findings are clearly wrong. Quality should have known when the roof sagged the second time after the jack was lowered that *392 professional engineering help was necessary to safely construct the renovation work. Quality provided contract welding services and did not provide, or even purport to provide, professional engineering services. When it became obvious that such expertise was necessary to safely do the work, it was negligence to continue the work without getting it. As indicated by the trial judge, "it was clear to anyone with the most rudimentary knowledge of construction that the work Gros called for was within the purview of a structural engineer."
The arguments by Quality that Cell-O-Mar failed to prove the requisite standard of care for a contract welder and that it was erroneously required to comply with the standard of care required of a structural engineer fail as a matter of law and fact. Questions of the existence of a duty and the general standard of conduct required by that duty are questions of law. Prosser and Keeton, The Law of Torts, § 37, pp. 235-238 (5th ed. 1984). The legal duty and general conduct applicable to Quality are established by law and have already been set forth in this assignment of error. As we perceive the ruling of the trial court, Quality was not found to be at fault for failing to comport with a particular standard of conduct[3] required of a contract welder; Quality was found at fault for failure to exercise ordinary care because it did not get or request expert assistance when such was obviously necessary. Cf. Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir.1977). We do not construe the trial court ruling as requiring Quality to comply with the standard of care expected of a structural engineer.
This assignment of error is without merit.

LIABILITY OF DANIEL AND CHRISTINE NAIL
Cell-O-Mar contends the trial court committed error by finding Christine Nail was not at fault. Specifically, Cell-O-Mar contends "Mrs. Nail had transcended the bounds of interior design and sallied into the realm of structural design" and "the trial court should have found Mrs. Nail liable for failing to exercise the care required of a structural engineer."
The trial court made the following factual findings with reference to Mrs. Nail:
The evidence indicated that she was hired for her skill as an interior designer to draw a set of plans for the internal structuring of the lay-out of the Spectrum Disco. This she did, and prepared a set of 9 interior plans and one additional plan for the construction of a freestanding exterior sign which was never completed.
Her plans, specifically P-13, contain the notation that the vertical beam on the stage was to be removed and a horizontal support of some type put in its place. This, however, is not any detailed architectural drawing or set of engineering specifications to detail exactly how this was to be carried out. As she testified, she proposed the removal of the beam for design or appearance reasons that had nothing to do with the structural considerations involved. In essence, she suggested the removal of the beam for aesthetic reasons only. She neither was asked or told anyone, including Mr. Gros, that this was possible without substituting an alternative support for the roof. She specifically instructed Mr. Gros that a structural engineer or someone expert in such matters should be consulted regarding the actual mechanics of removing the vertical beam and selecting the *393 needed components of the substitute support structure.
Although she provided other services in connection with the renovation of the Marcello's building, the only portion of those services which would render her liable herein would be those in connection with the beam in question. This is limited by her testimony and the testimony of all who touched on her role to drawing on P-13 the sketch suggesting the removal of her verbal contacts with Mr. Gros in this regard.
No one, especially Mr. Gros, considered Mrs. Nail to be expert in the engineering aspects of the designs she submitted; least of all herself. She testified that on one and perhaps two occasions, she advised Mr. Gros to get expert assistance regarding the construction aspects of removing the beam and replacing it with an alternate structure.
This is verified by the testimony of both Mr. Waguespack and Mr. Diedrich of Quality Industries. Neither of them indicated in their testimony that they relied in any way upon Mrs. Nail's drawings for guidance in ultimately, or even initially, confecting plans for the removal of the beam. They did not even refer to having seen these drawings. Mr. Waguespack testified that his decision on the nature of the support mechanism was primarily guided on the amount of space he had to work with.
Mr. Gros acknowledged that he had been instructed by Mrs. Nail to consult with a structural engineer regarding the size of the beam and other details of the replacement support structure. Of particular importance on this point was the testimony of Robert Hebert, the welding supervisor who actually put the structure into place. He also fails to indicate in his testimony any knowledge of or reliance upon Mrs. Nail's plans. His work was guided primarily by Mr. Waguespack and, indirectly, Mr. Gros.
Mrs. Nail was instrumental in suggesting that the beam be removed, but solely for appearance sake. She was not called upon by anyone to render an opinion on the feasibility of her drawings. This was so totally out of her field that it was or should have been obvious to Mr. Gros that further engineering studies by a structural engineer or architect were or should have been required before going forward with the work. He negligently failed or refused to hire structural engineering persons to properly prepare plans for the actual implementation of what was almost totally an aesthetic design consideration by Mrs. Nail. As such, any reliance placed in some expertise which she obviously did not have, and more importantly, did not hold herself out as having, was misplaced, and cannot form the basis of any liability on her part in this case.
Our review of the evidence shows that these factual findings are not clearly wrong. These factual findings reflect no breach of duty (negligence) by Mrs. Nail.
This assignment of error is without merit.

CONTRIBUTORY NEGLIGENCE OF CELL-O-MAR
Gros contends Cell-O-Mar was contributorily negligent because the roof and roof supports of the Cell-O-Mar building were defective, Cell-O-Mar failed to cure the defects as it had a responsibility to do and these factors contributed to the collapse of the building. Quality contends Cell-O-Mar "breached the duty imposed on it by Louisiana law", that there were "defects in the roof's design and maintenance" and "the plaintiff's negligence in this regard which preexisted the lease between plaintiff and defendant Gros could have played a significant role in the eventual collapse of the roof."
As previously indicated, the trial court correctly found as fact that the improperly constructed I-beam (composite beam) constructed by Quality for Gros caused the collapse of the roof of the building and that the building was capable of holding all loads reasonably expected before renovations were commenced. Implicit *394 in this factual finding is that any preexisting defects in the building were not a cause of the collapse. The arguments of Gros and Quality cannot prevail as a matter of fact. The factual ruling by the trial court that Cell-O-Mar was not contributorily negligent is not clearly wrong.
Further, Gros contractually assumed responsibility for the renovations of the building, and, thus, Cell-O-Mar was relieved of responsibility. Although Cell-O-Mar was aware that renovations were in progress, there is no evidence in the record to show Cell-O-Mar had knowledge that the roof sagged twice while Gros and Quality were attempting to install the I-beam. The trial court found as fact Cell-O-Mar "played no part in Gros's plans to convert the building into a disco."
This assignment of error is without merit.

COVERAGE OF AMERICAN
Gros, Cell-O-Mar and Quality contend the trial court erred in finding American did not provide insurance coverage for Quality. Specifically, they argue that the completed operations exclusion of the policy was not applicable because Quality had not anchored the flanking columns to the concrete floor with base plates or set posts for a sign on the outside of the building.
The American policy contained the following completed operations hazard exclusion:
It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage does not apply to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard.
A completed operations hazard was defined in the policy as follows:
"[C]ompleted operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,
(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.
[Emphasis added].
The law applicable to interpreting exclusions in insurance policies is set forth in Landry v. Louisiana Hospital Service, Inc., 449 So.2d 584, 586 (La.App. 1st Cir. 1984) as follows:
Any exclusion from coverage in an insurance policy must be clear and unmistakeable. If more than one interpretation of an exclusion is reasonable, the one affording coverage to the insured will be adopted.... The burden is on the insurer to prove the applicability of an exclusionary clause in a policy of insurance.
[Citation omitted].
The trial court ruled as follows:
Quality apparently did not consider the installation of the base plates or this outdoor sign significant; because, after it installed the defective and insufficient composite beam on or about June 16, *395 1978, the temporary jack supporting the composite beam was removed by June 21, 1978 (even though the base plates were not installed). The collapse occurred on or about July 5, 1978.
The court finds that the absence of the base plates and the outdoor sign were not significant; and that Quality had for all intentions and purposes, completed its operation of installing the defective and insufficient composite beam.
When the temporary jack was removed the defective and insufficient composite beam was put to its intended use.
The "completed operations hazard" of the policy applies. There is no liability against American Insurance Company herein.
The trial court found as fact that the I-beam and the flanking columns were put to their intended use when the jack was removed and they commenced supporting the roof. This factual finding is not clearly wrong. It is not alleged, and the evidence does not show, that the base plates for the flanking columns or the posts for the outdoor sign would in any way help the I-beam and flanking columns perform their intended use. The American policy is clear and unambiguous in providing that completed operations are not covered and that operations are completed when the portion of the work out of which the damage arises has been put to its intended use. The damage herein falls squarely within the definition of the exclusionary completed operations hazard clause, and coverage is excluded. See State Farm Fire and Casualty Company v. Avant, 404 So.2d 1311 (La.App. 2nd Cir.1981) and the cases cited therein.
This assignment of error is without merit.

COVERAGE OF NATIONAL
National contends the "trial court erred in finding coverage under the National ... policy issued to ... Gros." Specifically, National argues that this suit is for property damage, the damaged property was rented to Gros and, pursuant to exclusion (k) of the National policy, such claims are excluded from coverage.
National issued an owners', landlords' and tenants' liability policy of insurance to Gros d/b/a Fever Lights, 1900 Canal Boulevard, Thibodaux, Louisiana, for a period of February 14, 1978, to February 14, 1979, at a premium of $2,827. The policy had coverage limits of $500,000. National agreed to provide the following coverage to Gros for property damage liability:
To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined.
The definitions of the pertinent hazards are as follows:
Division 1PremisesOperations: The ownership, maintenance or use of the premises, and all operations necessary or incidental thereto.
....
Division 3Structural Alterations, New Construction, Demolition: Structural alterations, which involve changing the size of buildings or other structures, new construction and demolition, if the accident occurs in the course of such operations at the premises by the named insured or his contractors or their subcontractors.
Cell-O-Mar was made an additional insured, subject to the following provisions:
It is agreed that the "Persons Insured" provision is amended to include as an insured the person or organization designated above, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises designated above leased to the named insured, and subject to the following additional exclusions:
The insurance does not apply:
1. to any occurrence which takes place after the named insured ceases to be a tenant in said premises;
2. to structural alterations, new construction or demolition operations performed *396 by or on behalf of the person or organization designated above.
Paragraph (k) of the exclusions provides that National's insurance does not provide property damage liability coverage (coverage B) for the following:
(k) under coverages B and D, to injury to or destruction of (1) property owned or occupied by or rented to the insured, or (2) except with respect to liability under sidetrack agreements covered by this policy, property used by the insured, or (3) except with respect to liability under such sidetrack agreements or the use of elevators, property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control, or (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises;
If there is any doubt or ambiguity as to the meaning of a provision in an insurance policy, it must be construed liberally in favor of the insured and against the insurer. When the ambiguity relates to a provision which limits liability under the policy, the law requires that the contract be interpreted liberally in favor of coverage. Insurance Company of North America v. Solari Parking, Inc., 370 So.2d 503 (La. 1979); Credeur v. Luke, 368 So.2d 1030 (La.1979). Conversely, courts should not strain to find, against all the evidence, an ambiguity where none exists merely to afford added insurance protection to a party who freely chose to purchase only limited coverage. State ex rel. Guste v. Aetna Casualty and Surety Company, 417 So.2d 404 (La.App. 1st Cir.1982), affirmed, 429 So.2d 106 (La.1983); Arcement v. Norman Industries, Inc., 652 F.2d 395 (5th Cir. 1981); Business Air Center, Inc. v. Puritan Insurance Company, 593 F.Supp. 1048 (W.D.La.1984).
The pertinent policy provision herein provides "[t]his policy does not apply ... to injury to or destruction of ... property... rented to the insured". The Cell-O-Mar building that collapsed was rented to the insured, Gros. This policy provision is clear and unambiguous. U.S. Fire Insurance Company v. Liss, 357 So.2d 1356 (La.App. 4th Cir.1978). Thus, the policy does not provide liability property damage coverage to Gros for damage caused by him to Cell-O-Mar's building. The trial court ruling to the contrary is wrong as a matter of law. (It should be noted the policy did provide bodily injury liability coverage, which was not affected by this exclusion. Also, property damage to third persons was still covered.)
The trial court determined the policy was ambiguous because of the additional insured endorsement in favor of Cell-O-Mar. The exclusion of coverage in that endorsement is not applicable to the facts of this case because the structural alterations were not being performed by or on behalf of Cell-O-Mar but were being performed by and on behalf of Gros. Thus, Cell-O-Mar had property damage liability coverage if Gros and Quality had damaged the property of third persons.
This assignment of error has merit.

QUANTUM
Gros and Quality contend the trial court award of $138,343.31 is excessive. Specifically, they contend Cell-O-Mar was not entitled to full cost of restoration because the building was substantially altered and improved in the restoration process. In addition, they contend the award of $14,700 for lost rentals is "grossly inequitable".
After the roof collapsed, Cell-O-Mar contacted Al Badeaux, a structural engineer, to draw up plans for the restoration of the building. Badeaux's fee for this service was $1,620. Badeaux's plans called for a peaked (rather than flat) roof and stiffening the rear wall with a steel column. Cell-O-Mar contracted with National Building & Contracting Company to carry out the restoration. The total cost of the restoration was $132,762.31. Of this amount, Cell-O-Mar did not claim $250 for the installation *397 of a 6-inch channel iron column against the rear wall and $10,489 for installing the tapered roof blocks over the undamaged portion of the roof. Thus, Cell-O-Mar's claim for cost of restoration was $122,023.31.
The law applicable to property damage awards is set forth in Carter v. Gulf States Utilities Company, 454 So.2d 817, 819-820 (La.App. 1st Cir.1984) as follows:
In determining damages, the trier of fact is accorded much discretion, especially where the facts of the case preclude a precise computation of damages.... No mechanical rule of determining damages is to be applied; the quantum in each case must be determined considering the facts and circumstances of that case.... Although trial judges are granted great discretion in determining damage awards, these awards must be made in accordance with law.... The proper goal of a damage award is to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred.
...
Generally, three approaches have been followed by the Louisiana courts in arriving at the amount of damages to property; (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged.
[Citations omitted].
Cell-O-Mar was entitled to recover the $1,620 fee of the structural engineer. Cf. Mosely v. Sears, Roebuck and Company, 167 So.2d 408 (La.App. 1st Cir.1964).
There is no evidence of record to show that any other method of reparation is appropriate except cost of restoration. Because the work was performed, we know the actual cost. We have reviewed the pertinent evidence and conclude the award of $122,023.31 is reasonable and justified.
After the roof collapsed, Gros did not pay his monthly rental for a period of seven months. Neither Gros or Cell-O-Mar attempted to cancel the lease and it remained in full force and effect. At trial, Gros claimed he had a verbal agreement from Cell-O-Mar to forego the rent for the seven month period. Cell-O-Mar disputed this. The trial court apparently rejected Gros' testimony and accepted that of Sam Marcello on this point. This factual finding is not clearly wrong.
Gros is liable in contract to Cell-O-Mar for seven months rent. The seven payments not made by Gros were those due on the 28th days of the months of July 1978 to January of 1979. During this period of time, the monthly rental was $1,850. The monthly rental of $2,100 did not go into effect until the amended lease was executed on April 11, 1979, and made retroactive to January 28, 1979. The trial court committed error when it awarded $2,100 per month for each month during this period. The unpaid rentals are $13,200, rather than $14,700. The judgment will be amended to reflect this.
We note that the trial court judgment cast Quality and Gros (and National) for all sums awarded. Quality is not liable for satisfying Gros' contractual obligations to Cell-O-Mar and will not be cast for this portion of the award.

DECREE
For the foregoing reasons, the judgment against National is reversed and all claims against it are dismissed with prejudice. Judgment is rendered in favor of Cell-O-Mar and against Gros and Quality jointly, severally and in solido for $123,643.31, with legal interest thereon from date of judicial demand until paid and all costs, including the cost of this appeal. Judgment is rendered in favor of Cell-O-Mar and against Gros for $13,200, with legal interest thereon *398 from date of judicial demand until paid.[4] The judgment in favor of Gros on his third party demand against Quality for contribution is affirmed.
REVERSED IN PART; AFFIRMED IN PART; AMENDED AND AFFIRMED IN PART.
NOTES
[1] Various other defendants and third party defendants were dismissed prior to trial.
[2] On April 11, 1979, (after the collapse of the roof) the parties executed written amendments to the original lease but stipulated the amendments would not affect claims arising out of the collapse.
[3] Evidence (proof) of a particular standard of conduct and/or customary practices may be relevant to determine a breach of duty (negligence), but such evidence is not conclusive or controlling. Guilbeau v. Liberty Mutual Ins. Co., 338 So.2d 600 (La. 1976); Dye v. Kean's, 412 So.2d 116 (La.App. 1st Cir.1982), writ denied, 413 So.2d 506 (La.1982). Failure to present such evidence does not necessarily defeat a cause of action. Sosa v. New Orleans Public Service, Inc., 454 So.2d 1124 (La.App. 4th Cir. 1984); McCall v. Tassin Pile Driving, Inc., 383 So.2d 1373 (La.App. 4th Cir.1980).
[4] The trial court in its judgment awarded legal interest from date of judicial demand. This portion of the judgment was not contested on appeal. Ordinarily, contractual debts bear interest from the date they become due. La.C.C. art. 1938; Landry, 449 So.2d at 588.