536 So.2d 560 (1988)
Autley B. NEWTON, et al.
v.
STATE of Louisiana, Through the DEPARTMENT OF HEALTH AND HUMAN RESOURCES, OFFICE OF MENTAL HEALTH, Hammond Mental Health Center.
No. 87 CA 1011.
Court of Appeal of Louisiana, First Circuit.
November 22, 1988.
Paul H. Dué, Charles Roberts, Baton Rouge, for plaintiffs-appellants.
Caroline Norton, Asst. Atty. Gen., Baton Rouge, for defendant-appellee.
Before WATKINS, CRAIN and LeBLANC, JJ.
WATKINS, Judge.
This is a tort action by plaintiffs, the surviving husband and three children of the deceased, alleging medical malpractice by a DHHR psychiatrist resulting in the wrongful death of the deceased. The trial court ruled in favor of the defendant and against plaintiffs. Plaintiffs appeal devolutively.

*561 FACTS
The deceased, Meriam Newton, began to display symptoms of mental illness in the latter part of 1984. These symptoms progressed, with intervening treatment, into 1985. On October 21, 1985, Autley Newton, Meriam Newton's husband, went alone to the Hammond Mental Health Center (Center)[1] in order to arrange to have his wife evaluated for possible involuntary commitment to a state mental facility. Mr. Newton initially spoke with Michael Ibert, the Center's manager, and attempted to explain his wife's problems. Mr. Ibert arranged an appointment with Dr. Hiram Haynie, a psychiatrist employed at the Center.
That afternoon, Mr. Newton got his wife to voluntarily meet with Dr. Haynie, who conducted a psychiatric evaluation. Dr. Haynie concluded that Mrs. Newton was not within the category of persons who by law may be committed involuntarily. Rather, he referred her to a private psychiatrist, Dr. John Pratt, for out-patient treatment. Mrs. Newton saw Dr. Pratt several times subsequent to October 21, 1985 and prior to November 13, 1985.
On Wednesday, November 13, 1985, Mr. Newton went to see Mr. Ibert again to set up another evaluation of his wife due to incidents which occurred after their first visit. Mr. Ibert related this information to Dr. Haynie, who agreed to see Mrs. Newton at any time. On Friday, November 15, 1985, Mr. Newton informed the Center he was bringing his wife in for evaluation; however, he later telephoned Mr. Ibert saying that he would bring his wife in on Monday or Tuesday, since she was going to Shreveport for the weekend. However, Mrs. Newton refused to go to the Center on Monday, and Mr. Newton did not attempt to have her brought in under an emergency custody pick-up, although he was aware of the law concerning this procedure. On the morning of Tuesday, November 19, 1985, Meriam Newton committed suicide.

MALPRACTICE UNDER LSA-R.S. 28:50 et seq.
Appellants contend the trial court "erred in concluding that defendant should not be liable to plaintiffs for the wrongful death of Mrs. Newton."
Part III of Chapter 1 of Title 28 of the Louisiana Revised Statutes is entitled Examination, Admission, Commitment, And Treatment Of Persons Suffering From Mental Illness And Substance Abuse. LSA-R.S. 28:50 provides as follows:
The underlying policy of this Chapter is as follows:
(1) That mentally ill persons and persons suffering from substance abuse be encouraged to seek voluntary treatment.
(2) That any involuntary treatment or evaluation be accomplished in a setting which is medically appropriate, most likely to facilitate proper care and treatment that will return the patient to the community as soon as possible, and is the least restrictive of the patient's liberty.
(3) That continuity of care for the mentally ill and persons suffering from substance abuse be provided.
(4) That mental health and substance abuse treatment services be delivered as near to the place of residence of the person receiving such services as is reasonably possible and medically appropriate.
(5) That individual rights of patients be safeguarded.
(6) That no person solely as a result of mental illness or alcoholism or incapacitation by alcohol shall be confined in any jail, prison, correctional facility, or criminal detention center. This shall not apply to persons arrested, charged, or convicted under Title 14 of the Louisiana Revised Statutes of 1950.
(7) That no person shall be denied treatment solely because he has withdrawn from treatment against medical advice on a prior occasion or because he has relapsed after an earlier treatment.
*562 LSA-R.S. 28:51 provides, in pertinent part, as follows:
A. The director of a treatment facility, subject to the availability of suitable accommodations, shall receive for observation, diagnosis, care, and treatment, any person whose admission is authorized under any of the procedures provided for in R.S. 28:52 through R.S. 28:54 and R.S. 28:64.
. . . .
C. The Department of Health and Human Resources, through its hospitals, mental health clinics and similar institutions, shall have the duty to assist petitioners and other persons in the preparation of petitions for commitment, requests for protective custody orders and requests for emergency certificates, upon request of such persons.

Examination on October 21, 1985
Plaintiffs argue that Dr. Haynie was negligent in his evaluation of Mrs. Newton on October 21, 1985, apparently because he did not find at that time that Mrs. Newton was sufficiently dangerous to herself so as to justify an emergency commitment.
This evaluation was conducted to determine whether an emergency certificate could be issued pursuant to LSA-R.S. 28:53, which provides, in pertinent part, as follows:
A. (1) A mentally ill person or a person suffering from substance abuse may be admitted and detained at a treatment facility for observation, diagnosis, and treatment for a period not to exceed fifteen days under an amergency certificate.
. . . .
B. Any physician may execute an emergency certificate only after an actual examination of a person alleged to be mentally ill or suffering from substance abuse who is determined to be in need of immediate medical treatment in a treatment facility because the examining physician determines the person to be dangerous to self or others or to be gravely disabled. Failure to conduct an examination prior to the execution of the certificate will be evidence of gross negligence. The certificate shall state:
(1) The date of the physician's examination of the person, which shall not be more than seventy-two hours prior to the date of the signature of the certificate.
(2) The objective findings of the physician relative to the physical and mental condition of the person, leading to the conclusion that the person is dangerous to self or others or is gravely disabled as a result of substance abuse or mental illness.
(3) The history of the case, if known.
(4) The determination of whether the person examined is in need of immediate psychiatric treatment in a treatment facility because the patient is:
(a) dangerous to himself;
(b) dangerous to others; or
(c) gravely disabled.
(5) A statement that the person is unwilling or unable to seek voluntary admission.
The certificate shall be dated and executed under the penalty of perjury, but need not be notarized. The certificate shall be valid for seventy-two hours and shall be delivered to the director of the treatment facility where the person is to be further evaluated and treated.
The standard of care required of Dr. Haynie in this situation is controlled by LSA-R.S. 28:63 which provides, in pertinent part, as follows:
Any licensed physician exercising that degree of skill and care ordinarily employed, under similar circumstances by members of his profession in good standing in the same community or locality, and using reasonable care and diligence with his best judgment in the application of his skill, shall not be held civilly liable or subject to criminal prosecution for acts arising from his medical opinions, judgments, actions or duties pursuant to any of the provisions of this Part.
Any licensed physician who executes an emergency certificate shall be held to that degree of skill and care ordinarily employed, under similar circumstances by members of his profession in good *563 standing in the same community or locality, and using reasonable care and diligence with his best judgment in the application of his skill.
Initially we note that diagnostic error by a physician is not malpractice per se. Diagnosis is an act of professional judgment and, in case of misdiagnosis, malpractice exists only if it results from the physician's failure to exercise the standard or degree of care in diagnosing which would have been exercised by members of his profession in good standing in his locality under similar circumstances. Frasier v. DHHR, 500 So.2d 858, 862 (La.App. 1st Cir.1986).
Based on the evidence presented at trial, plaintiffs' expert psychiatrist, Dr. Richard P. Strobach, testified that Dr. Haynie's evaluation on October 21, and his resulting opinion, constituted negligence. Defendant's expert psychiatrist, Dr. Gene Usdin, testified that Dr. Haynie's actions constituted an "excellent standard of care." The weight given the testimony of an expert is determined by his qualifications, experience in the field and the facts upon which his opinion is based. The trial judge has considerable discretion, which should not be disturbed absent manifest error, in accepting or rejecting such testimony. Orgeron v. Dobkowski, 476 So.2d 458 (La. App. 1st Cir.1985); see also Anthony v. Hospital Service District No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). We cannot say that the trial court was manifestly erroneous in accepting the testimony of defendant's expert in this regard.

Events of November 13, 1985
Plaintiffs contend that even if Dr. Haynie's October 21 evaluation of Mrs. Newton was not below the required standard of care, the actions of Dr. Haynie on November 13, 1985, and thereafter, clearly constituted negligence. They argue that the Hammond Mental Health Center and Dr. Haynie had an affirmative duty under LSA-R.S. 28:51C to assist Mr. Newton in obtaining the involuntary commitment. The trial court did not find, nor do we, that Dr. Haynie or Mr. Ibert were negligent in carrying out their duties under Title 28. When Mr. Newton saw Mr. Ibert on November 13, 1985 he was told that Dr. Haynie would see him and/or Mrs. Newton at any time. In response to Mr. Newton's inquiry, Mr. Ibert informed him that persons were admitted to the state mental hospital without having to come through the mental health center, and that he could bring his wife directly to the hospital. Mr. Ibert also explained to Mr. Newton the procedure for emergency custody pick-up. When Mr. Newton left the mental health center on November 13, 1985, Mr. Ibert testified that he expected Mr. Newton to speak with his wife and be back in contact with him.
Later the same day Dr. Haynie spoke with Dr. Pratt, who had been treating Mrs. Newton, in regard to her status. Following this conversation, Dr. Haynie telephoned Mr. Newton, but was unable to reach him at home or at his office. The record does not reflect that there was any further contact between Dr. Haynie and Mr. Newton from November 13, 1985 to the date of the tragic death of Mrs. Newton.
However, two days later on November 15, 1985 Mr. Newton called the mental health center and left a message for Mr. Ibert informing him that he would be bringing his wife in that afternoon. Later that day he called Mr. Ibert and told him that his wife was going to Shreveport on business and that she would come to the center on Monday or Tuesday.
In view of the foregoing we find no breach of the duty imposed upon the mental health center under LSA-R.S. 28:51C.
Plaintiffs base their contention of breach of duty in part on the assumption that a doctor-patient relationship existed between Dr. Haynie and Mrs. Newton at that time, which required that Dr. Haynie actively seek information from Dr. Pratt and thereafter contact Mr. Newton and urge him to bring his wife to the Center immediately. Mr. Newton contended at trial that if Dr. Haynie, or Mr. Ibert, could have assured him that an emergency certificate would be *564 issued, he would have gotten her to the Center immediately.[2]
The record clearly shows that Dr. Haynie was no longer the treating physician at this time, since Mrs. Newton had been referred to Dr. Pratt, who had engaged in treating her.
Dr. Usdin testified, in pertinent part, as follows:
Q. Do you feel that there is any duty incumbent on a psychiatrist under those circumstances, under Dr. Haynie's circumstances to call and follow behind the treating physician with recommendations or with medical information or any other thing?
A. I don't know that I have ever had that done in the thirty-five .. thirty-four years in which I've practiced. There may be an interest in the patient but I would not appreciate the involvement of the referring physician. I've had persons come up to me afterwards and say how is Mrs. Jones going but I've never had them follow back .. unless, there would be some reason why they think that patient may not have kept that appointment then I would, occasionally I'm concerned that a patient wouldn't keep the appointment then I have done it in those instances, but otherwise, I don't think I should be involved.
After establishing that Dr. Haynie could not properly act as a treating physician once Dr. Pratt became involved, Dr. Usdin further testified as follows:
Q. Going back to the progress notes from the 13th and the 15th, do you see any deviation from the appropriate standard of care from Dr. Haynie's not getting on the phone and calling Autley Newton and telling him that she had to come go into the hospital?
A. Not unless there's more information than I have. Not unless there was portrayed to Dr. Haynie a real basis for either mental decompensation .. mental .. markedly mental decompensation or a great potential for suicide. I think had I been called directly and my understanding is that this information came to Dr. Haynie through a fellow worker at the Mental Health Center I would have suggested that Mr. Newton immediately get .. if he was concerned, if I was alarmed .. I still would not have taken that responsibility. The treating physician was another physician.
Q. Okay.
A. Occasionally a patient will try to reinvolve you and it just isn't good to interfere with what's been going on especially if that physician has had a few contacts with the patient and should know .. and more recent contacts and therefore should know much more about the patient's status than you do.
Q. With regard with the idea of formulating a treatment plan, is it the appropriate standard of care for a referring physician who does not anticipate ever seeing the patient again to formulate a treatment plan?
A. No I don't think it is. You refer them hopefully to a respectable colleague.
Mr. Newton admitted that he had already been informed by Dr. Pratt that Mrs. Newton was in need of hospitalization. We are unable to understand the basis of plaintiffs' contention that Dr. Haynie should have informed Mr. Newton of something which he already knew.[3]
Further, LSA-R.S. 28:53 prohibits the issuance of an emergency certificate unless an examination is conducted within seventy-two hours prior to the signing of the *565 certificate. Logic dictates that if Dr. Haynie would be guilty of gross negligence in issuing an emergency certificate without conducting an examination, then assuring a relative of the issuance of an emergency certificate without an actual examination would also be improper.
We cannot say that the trial court was in error in accepting Dr. Usdin's opinion regarding the events on or about November 13. See Orgeron, supra. As stated above, we also agree with the trial court that plaintiffs have failed to establish that any duty under Title 28 was breached by defendant.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Plaintiffs are assessed the cost of this appeal.
AFFIRMED.
NOTES
[1] The Center is a state facility, controlled by the State of Louisiana through the Department of Health and Human Resources, Office of Mental Health.
[2] Mr. Newton alleges that he would have obtained a custody order under LSA-R.S. 28:53.2.
[3] Nevertheless, the record reflects that Dr. Haynie did talk to Dr. Pratt on the afternoon of November 13, 1985. Dr. Pratt indicated to him that hospitalization was definitely necessary. Dr. Haynie correctly assumed that Dr. Pratt told this to Mr. Newton.