WATKINS, Judge.
This consolidated suit is an action for damages for defamation by plaintiff against the State of Louisiana through the Department of Health and Human Resources (DHHR) and a state employee. The trial court ruled in favor of the defendants and dismissed plaintiff’s suit. Plaintiff appealed devolutively.
FACTS
This case was consolidated for trial with Newton, et al v. State of Louisiana, et al., 536 So.2d 560 (La.App. 1st Cir. 1988).[1]
Plaintiff, Autley Newton, had his wife examined in October, 1985, by Dr. Hiram Haynie, a psychiatrist employed by the DHHR at the Hammond Mental Health Center. Dr. Haynie referred Mrs. Newton *566 to Dr. John Pratt, a private psychiatrist, who treated her thereafter. Approximately one month later, plaintiffs wife committed suicide at their home.
In his petition, plaintiff made the following factual allegations:
Upon learning of the death of the late Mrs. Newton, defendant, Dr. Haynie, while at all times acting in the course and scope of his employment with defendant, Hammond Mental Health Center, made statements to Michael Ibert, administrator or manager of the Hammond Mental Health Center, as well as to other employees of the Hammond Mental Health Center, to the effect that the late Mrs. Newton may not have committed suicide, but may instead have been murdered by her husband, plaintiff herein.
[[Image here]]
Defendant Dr. Haynie, again while acting in the course and scope of his employment with defendant, Hammond Mental Health Center, likewise made similar statements in a telephone conversation which he had a couple of weeks or so following the death of Mrs. Newton with Dr. John Paul Pratt.
[[Image here]]
Additionally, defendant Dr. Haynie, while giving his deposition testimony on October 9, 1986, in the originally-filed aforementioned medical malpractice suit, which deposition statements were again made by defendant Dr. Haynie in the course and scope of his employment with defendant, Hammond Mental Health Center, again made such statements in the presence not only of the attorneys of record in the aforementioned medical malpractice case, but also in the presence of the court reporter who was reporting the deposition, and further admitted that he still harbors such thoughts, including, stating, for example, where did the gun come from, if not from Mr. Newton. Defendant Dr. Haynie made similar statements concerning the gun in his earlier conversations referred to in Paragraphs 3 and 4.
[[Image here]]
Such statements are defamatory per se, utterly untrue, are malicious and were at all pertinent times made in utter reckless disregard of the truth or as to whether they were true or not, with the result that plaintiff is entitled to recover damages from defendants, in solido, for such defamation, mental anguish and distress, impaired social standing in the community, and impaired character and reputation in the principal sum of FIVE MILLION AND NO/lOO DOLLARS ($5,000,000.00).
The defendants denied these allegations and asserted in their answers “that any expressions complained of herein made by Dr. Haynie concerning the death of Meriam A. Newton are privileged in that they consist solely of questions and/or personal comments shared with fellow health care providers concerning the death of a person whom they had treated, and at no time were communicated as statements of existing objective fact uttered with malicious intent to defame.”
When questioned by plaintiffs attorney, Dr. Haynie testified, in pertinent part, as follows:
Q. All right, sir. Let’s talk about then after Mrs. Newton was killed .. died .. from the suicide, what if any conversations did you have with anybody at the Hammond Mental Health Center concerning the question of whether it may not have been death by her own hands but that Mr. Newton might have shot her?
A. We were all shocked to hear it, naturally. And the first .. I .. what actually happened is that when I heard it, you know, I thought, my God, what happened. Mr. Newton was supposed to have gotten rid of all the guns. What on earth happened here and I associated that with Mr. Newton’s frustration and very mixed feelings toward his wife and I had the fantasy, you suppose he shot her? In discussing that with Mr. Ibert, you know, we were all kind of having this reaction and I shared that with Mr. Ibert. I will volunteer that one person has been *567 excluded from this. I shared it with Mr. Tom Smith, the senior psychiatric social worker who was aware of the Newton’s presence and had, as our senior clinician and I shared it with Dr. Pratt when I called to give him the tragic news .. it turns out just pondering what had happened .. this was my, you know, it’s just the kind of thing that anybody would have when you hear of some tragedy .. what happened, you know, what went wrong and I shared this in a confidential way with fellow clinicians just in speculating on the various possibilities. But as I indicated in my deposition with you, I certainly .. I strong favored the idea that it had been suicide as I pondered it but that wasn’t what first crossed my mind and each of those three people that I said that too, they all said back to me, that’s the first thing I thought of too unquote and, You know, but this was a confidential thing. We didn’t tell anybody else in the .. on the staff this and as far as I know anybody anywhere.
Q. And with respect to Dr. Pratt, you indicated that [you] might have brought it up first, correct?
A. Oh yes I did. Sure. But he told me the same thing back. That’s what he thought of too as soon as I said it to him.
Q. And you also expressed the thought, did he let her go to Shreveport unconsciously because he had some need for her to buy a gun and shoot herself. Did you also harbor that thought?
A. I don’t recall that but that certainly sounds plausible .. unconsciously now mind you but I don’t know that so. Let me say, Mr. Due, I want Mr. Newton to hear this. Because I am nieve about legal procedures and such. I don’t even remember the context of how this came out in the deposition that I offered this psycho-dynamic formulation that went through my mind but it never occurred to me that Mr. Newton was going to hear this .. and be pained by my having said that. I regret that very much.
Q. Now, also, the way you characterize it in your deposition that .. cause I asked you .. I gather .. at the time of the deposition, I gathered it that you still had these thoughts and that was back on October 9, 1986, correct? I did ask you that question and do you remember what your answer was?
A. Yea, that .. we had never had any information about the details of the tragedy and I just didn’t know for sure what had happened. I hadn’t heard about the trip to .. I think this is correct ... my timing may be off, .. but I hadn’t heard about the trip back to Shreveport and where she could have gotten the gun and everything else but after it’s all in perspective, I, you know, I am .. I certainly don’t have the idea at the present time that he caused his wife’s death by shooting her.
Q. Sir, that .. the fact that you claim that .. the very thing that you said right before that on page 141, beginning at line 11: “Did he let her go to Shreveport unconsciously because he had some need for her to buy a gun and shoot herself? I have no idea you know. There’s no way we’ll ever know that.” And then I asked you right after that, “Now, you know about the Shreveport situation.” Question, “Well, now, I gather you still had these thoughts?” And you answer, “Yea, I can’t rule that possibility out. I guess if you’re asking me to vote, you know, I would say I vote that she killed herself. I would favor that probability.”
A. Right.
Q. So you did make the statement that you still couldn’t rule out that possibility even though you knew that she had gone to Shreveport?
A. That’s right. What I meant a minute ago, though, is that since my deposition, I have read Mr. Newton’s deposition and Dr. Pratt’s .. well mostly Mr. Newton’s deposition influenced me that I do feel differently from reading his deposition. It put more reality and *568 sequence of events and I see now I would feel differently about it from having read his deposition.
When questioned by his own attorney, Dr. Haynie testified as follows:
Q. Have you ever stated as an objective fact to anyone that Autley Newton killed his wife?
A. I have not.
Q. Have you ever stated as an objective opinion to anyone that you felt sure that Autley Newton had killed his wife.
A. No, I have not. No.
Q. In making your comments to Mr. Ibert or the mutual kind of comment apparently it seems to be that considering the possibility, did you ever during that period of time either in the conversation with Mr. Ibert or Dr. Pratt, every intend to malign the reputation of Mr. Autley Newton?
A. No, I certainly did not.
Q. Had you been advised by counsel that the depositions in this case were to be kept under seal and away from public scrutiny?
A. Yes, I have.
In its written reasons for judgment the trial court stated, in pertinent part, as follows:
The only issue herein is was there malice, actual or implied, when Dr. Hayne [sic] communicated to three or four fellow professionals, the possibility that Autley Newton might have shot his wife.
The communications were in the framework of scientific questions and intellectual exploration. The Court has not been presented with and outright charge or affirmative statement by Dr. Haynie that Mr. Newton committed such an act.
Thus, the element of malice is totally absent. Therefore, the Court finds no libel exist herein.
DEFAMATION
Plaintiff contends the trial court erred in concluding that Dr. Haynie’s actions did not constitute defamation.
In order to maintain an action in defamation, the plaintiff must prove the following elements: (1) defamatory words, (2) publication, (3) falsity, (4) malice, actual or implied, and (5) resulting injury. Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101, 1105 (La.1988). Words which impute a crime to another are defamatory per se. Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La.1980). However, a person may enjoy a qualified or conditional privilege in making a statement, if it is made (1) in good faith, (2) on a subject in which the person communicating has an interest or owes a duty, and (3) to a person having a corresponding interest or duty. O’Dell v. Deich, 496 So.2d 1074 (La. App. 4th Cir.1986). See also Alford v. Georgia-Pacific Corp., 331 So.2d 558 (La.App. 1st Cir), writ denied, 334 So.2d 427 (La.1976).
Initially, we note that Dr. Haynie never alleged as a fact that the plaintiff was responsible for his wife’s death. The record reflects that Dr. Haynie was merely seeking opinions as to this hypothesis from co-employees and Dr. Pratt, all of whom clearly had an interest in the events concerning Mrs. Newton, whether as former treating physicians or as concerned members of the public who were familiar with the events leading up to her death.[2] Contrary to plaintiff’s allegations in brief, the privilege does not depend on the continued existence of a doctor-patient relationship which obviously no longer exists after the death of a patient. Rather, the professional training of Dr. Haynie and his colleagues, coupled with their familiarity with the prior events, clearly places these communications “in the framework of scientific questions and intellectual exploration” as stated by the trial judge.
There is no evidence of any malice whatsoever on Dr. Haynie’s part. He made every attempt to keep his thoughts and discussions with his colleagues confidential. In fact, Mr. Newton’s own testimony reflects that neither he, nor the public, were aware of Dr. Haynie’s doubts until Mr. *569 Newton’s own attorney elicited this information, apparently by accident, at a pre-trial deposition.[3]
The trial court was correct in concluding that Dr. Haynie’s actions did not constitute defamation.[4]
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The cost of this appeal is assessed against plaintiff.
AFFIRMED.

. See this court’s statement of facts in Newton v. State of Louisiana, 536 So.2d 560 (La.App. 1st Cir.1988) (decided this same docket).

. Cf. O’Dell v. Deich, supra.

. Parties to a suit also enjoy a qualified privilege for defamatory statements made therein, if the allegations are material, and are made with probable cause and without malice. Lincecum v. Adserve, Inc., 417 So.2d 1247 (La.App. 1st Cir), writ denied, 422 So.2d 420 (La.1982). However, an action for defamation arising out of allegations or statements made in a judicial proceeding cannot be brought by a party to the judicial proceeding, until the proceeding is terminated. Kent v. Stewart, 413 So.2d 583 (La. App. 1st Cir. 1982). Accordingly, this opinion only addresses those statements made by Dr. Haynie prior to these proceedings.

. In addition, Mr. Newton could not say that he was damaged to any extent as a result of Dr. Haynie’s statements.