591 So.2d 713 (1991)
Eugene A. USNER, Jr.
v.
Richard STROBACH.
Eugene USNER, Jr.
v.
Richard B. STROBACH.
Nos. CA 90 0885, CA 90 1120.
Court of Appeal of Louisiana, First Circuit.
November 22, 1991.
Writ Denied January 31, 1992.
*715 Charles B. Colvin, New Orleans, for E. Usner.
Curtis M. Baham, Jr., Hammond, for Richard Strobach.
Robert L. Redfearn, J. Thomas Hamrick, Jr., New Orleans, for La. Medical Mut. Ins. Co.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
This action is a suit for damages in tort by Eugene A. Usner, Jr., a social worker, against Dr. Richard P. Strobach, a psychiatrist, wherein Usner alleges Strobach defamed him and "tortiously interfered with his business". Strobach answered and filed a third party demand against Louisiana Medical Mutual Insurance Company (LMMIC), his medical malpractice insurer, alleging LMMIC provided coverage for the risk herein, LMMIC owed him a duty to defend this action that it refused to perform, and LMMIC was obligated to indemnify him for all sums for which he was cast in judgment. A trial by jury resulted in a verdict that Usner failed to prove "by a preponderance of the evidence, all of the essential elements of defamation...." The trial court rendered a judgment on the merits according to the jury's verdict. The trial court rendered a supplemental judgment for Strobach on his third party demand against LMMIC for an attorney fee of $7,855, and, pursuant to La.R.S. 22:658, awarded a penalty of 12% of the attorney fee. Usner took a devolutive appeal; LMMIC took a suspensive appeal; and this court consolidated the appeals.

FACTS
Usner was a board certified social worker with a master's degree in social work and ten years experience when he moved from New Orleans to Hammond in July, 1983. His experience was primarily in the treatment of substance abuse, but he wanted to broaden his area of practice. He met with doctors, lawyers, clergymen and others in the community to introduce himself to them and to develop a source of referrals.
Strobach and his partner, who is now deceased, were the only psychiatrists practicing in Tangipahoa Parish when Usner moved to Hammond. Usner called Strobach, gave him some information about his background and credentials, and attempted to arrange a meeting. Strobach testified he told Usner "it was a shame" he was not going to continue to practice only in the area of substance abuse. Strobach told Usner he worked with four other social workers, and if Usner intended to practice in the same areas they did, he was unlikely to make any referrals to him.
Sometime later Strobach attended a dinner meeting at the home of Ron Macaluso, a Hammond attorney. During the dinner they talked about a notorious criminal trial in which they were both involved some years before. Macaluso had been appointed to represent a defendant, Copeland, who was on trial for first degree murder. See State v. Copeland, 419 So.2d 899 (La.1982) and 530 So.2d 526 (La.1988). Macaluso retained a social worker as an expert witness to testify about whether Copeland was sane at the time he committed the crime. *716 Strobach helped the assistant district attorney prosecuting the case in preparing questions for cross-examination of the social worker on voir dire to show that he was unqualified to give an opinion about Copeland's sanity.
Strobach testified he was aware of the Copeland social worker's qualifications but never learned his name. During the dinner at Macaluso's, Usner's name was mentioned. Strobach then assumed Usner was the Copeland social worker. His belief was reinforced by statements he overheard at the Mental Health Clinic. One of the social workers at the clinic stated that Usner was involved in a custody case but was not expected to testify because "he had once had a very bad experience in court."
In March, 1984, Dr. Ralph Chester was stationed at the Mental Health Clinic in Hammond for residency training in general psychiatry. Strobach was one of the supervising psychiatrists at the clinic. A patient, referred to in the record as "Mrs. X" for privacy reasons, came to the clinic. Dr. Chester learned from Mrs. X's medical history she had once been very depressed but had recovered fully under Strobach's care. He also learned she had recently been treated by Usner on the recommendation of Dr. David Gaudin, a Hammond internist.
Dr. Chester determined Mrs. X needed hospitalization. He consulted with Strobach, and Strobach agreed with Dr. Chester's diagnosis and recommendation that she be hospitalized.
Strobach was angry that a patient who had gotten well under his care was sick again and, in his opinion, avoidably so. Dr. Chester testified Strobach was frustrated about the care patients got before seeing a psychiatrist. According to Dr. Chester, Strobach went "over and over again that he was mad about it."
After he left the clinic that day, Strobach called Dr. Gaudin and asked if he had referred Mrs. X to Usner. Dr. Gaudin told Strobach he had treated Mrs. X at the emergency room of Seventh Ward Hospital in Hammond for an overdose. He had difficulty getting a psychiatric consultation on a weekend, so he had referred her to Usner.
Strobach testified he gave Dr. Gaudin the names of the social workers with whom he worked and told Gaudin he would mail a list of names to him. He then told Dr. Gaudin "what I thought of Mr. Usner in terms of his participation in [the] Copeland trial." He followed up with a letter to Dr. Gaudin dated March 15, 1984, which listed psychiatric resources available on weekends. After providing this information, Strobach gave Dr. Gaudin his opinion of Usner, as follows:
I have given you the names of therapists I trust because they know their limits and they know when to contact a physician. In my opinion, Mr. Usner suffers from a syndrome not uncommon to many paraprofessionals. They desire to be a doctor, are grandiose and feel they can evaluate and treat any disorder. I have seen this type of mentality before and it is dangerous. That is why I do not affiliate myself with any individual who would join Mr. Usner in his office practice. He is experienced to counsel substance abuse patients solely.
One final note is that Mr. Usner will never be forgotten by me, Mr. Duncan Kemp or a particular family. A few years ago, a ten year old boy was kidnapped in Baton Rouge by two homosexuals. The boy was molested, sodomized and eventually murdered by one of the men when they reached Livingston Parish. The homosexual man tied the boy's hands behind him, made him lean forward and then fired a .12 gauge shotgun to the back of his brain. He missed with the first shot, then reloaded and did not miss the second time. The man pled not guilty by reason of insanity. The defending attorney, Mr. Ron Macaluso, sought an expert to say that the man was insane at the time of the crime. He found Mr. Usner, who was subsequently disqualified as an expert, but not forgotten by everyone involved. Some people will do anything for money. You have dealt with him, possibly met him and will hopefully reconsider your relationship with him.

*717 The next time a crisis evolves because of the treatment of Mr, Gene Usener, I intend to discover if a physician referred the patient to Mr. Usner. If so, I will then refer the case back to the referring physician. Perhaps, when the headaches, hassels (sic) and frustration of dealing with hospital placement and also dealing with bad therapy are experienced, then the referring physician will understand clearly the importance of a competent referral and understand the consequences of incompetent counselling treatment. Would you rather deal with DOE secondary to pulmonary edema at the very onset of the illness or have the patient sent to the ER semicomatose and cyanotic after treatment by an incompetent physician?
* * * * * *
I hope you share this referral information with your colleagues, in particular the Chiefs of Staff and other doctors who might be referring to Mr. Usner, as well as the physicians in charge of the emergency room call. I certainly remain your friend. I cannot be all things to all people at all times, but I can help to see that patients have competent alternatives. I will continue to refer to you and your associates because I know that patients will receive the highest quality care.
(Emphasis in original)
When Dr. Gaudin received this letter, he was "shocked", "surprised and taken back." At trial he could not remember specifics of the earlier telephone conversation with Strobach, but he was certain he did nothing to precipitate the letter. Since he had been favorably impressed with Usner's ability before receiving the letter, he immediately called Usner and asked Usner to meet him at his office to discuss the letter. He also showed the letter to his partner, Dr. Caulfield.
Dr. Gaudin met with Usner and asked him to provide references on his training and education. He also asked him about his role in the Copeland trial. After Usner assured him he was not the Copeland social worker and provided references, Dr. Gaudin's confidence in Usner was restored. Dr. Gaudin testified he continued to refer patients to Usner and holds him in high professional esteem.
During this same time frame, according to Strobach, another patient, Mrs. Y, came into the Mental Health Clinic "schizophrenic and hallucinating."[1] Mrs. Y was a patient of Dr. Mark Berry, a Hammond obstetrician-gynecologist, who was president of the Tangipahoa Parish Medical Society. Dr. Berry had given Mrs. Y the option of seeing either a psychiatrist or a social worker. Mrs. Y had chosen a social worker for financial reasons. Dr. Berry had then referred her to Usner.
When Strobach learned Usner had treated Mrs. Y on Dr. Berry's referral, he called Dr. Berry. Dr. Berry testified Strobach asked him: "Didn't you receive that letter I had written you all about this individual?" When Dr. Berry replied he had not, Strobach told him to check with his partners. At trial, however, Strobach denied sending letters to any physicians other than Dr. Gaudin.
Strobach told Dr. Berry he was upset because Dr. Berry had referred Mrs. Y to Usner. Strobach advised Dr. Berry that Usner (1) did not realize his limitations; (2) tended to take on "problems over his head"; (3) did not seek proper supervision; (4) was not properly trained to do some of the work he had done; and (5) acted unethically in testifying in the Copeland trial.
After receiving this call, Dr. Berry was puzzled. He had not heard any other doctor or patient say a bad word about Usner. He called Usner and asked for an explanation. Dr. Berry testified Usner was "tremendously upset" to learn of Strobach's call to Dr. Berry. He convinced Dr. Berry he was not the Copeland social worker. He told Dr. Berry he wanted an apology from Strobach and wanted the record set *718 straight that he had nothing to do with the Copeland case. He told Dr. Berry he might even see a lawyer if no apology was forthcoming. Dr. Berry then called Strobach and attempted to act as an intermediary, without success. He also talked to his partners, Drs. Black, Gaudin, and Caulfield about the call. Dr. Caulfield said he had gotten some sort of letter and was aware there was an ongoing problem between Usner and Strobach.
Meanwhile, four days after writing the letter to Dr. Gaudin, Strobach also wrote to Duncan S. Kemp, III, the District Attorney for the Twenty-first Judicial District. Strobach began the letter by listing four therapists with whom he had a professional relationship. The letter continued:
There is, however, a new social worker in town, Mr. Gene Usner, M.S.W. This letter concerns him.
I am in no way considering a professional relationship with this man and do not trust him in the least. He has approximately eight years experience in substance abuse counselling at the ADU Unit at Mandeville, however, he now purports to be able to do any form of counselling. This is of no concern to me, because such individuals eventually are discovered to be charlatans. The concern lies in another area. If you will recall the Copeland trial, you will recall that Mr. Ron Macaluso obtained an expert who was willing to say that Mr. Copeland did not know right from wrong at the time of the crime. This individual was Mr. Gene Usner. Billy [the assistant district attorney] called me concerning him and his credentials. I spent approximately 15 to 20 minutes on the phone with Billy and helped him formulate questions to undermine the credentials of Mr. Usner. It is hoped that any individual who would take the viewpoint that Mr. Copeland did not know right from wrong at the time of that horrible murder, would certainly not be considered as acceptable as a counsellor participating in a PTI [pretrial intervention] program. I know Mr. Usner has already been involved with the counselling of Sammy and his family, and thus I did not wish for any other individuals to be conned by his charm and charisma.
Kemp testified he did not pay close attention to the name in the letter. He sent a memo to his staff that pretrial intervention referrals should not be made to Usner. He also wrote to Strobach and stated he agreed with his opinion of Usner.
About a month later, Kemp heard about "a little controversy brewing in the community about these letters [about Usner] that had gone out." He remembered the letter he received from Strobach and decided to give it a closer look. When he did, he discovered Usner was not the Copeland social worker. He wrote to Strobach on April 26, 1984, and advised him that Gene Usner was "not the same gentleman you were speaking of in that letter."
When Strobach received Kemp's letter, his first response was to call his attorney. His attorney told him to call Usner and advised him not to inflame things any more than necessary. Strobach testified he called Usner and offered to take him to lunch, but Usner, after talking to his attorney, refused. Usner testified he did not recall such a telephone conversation.
Dr. Bill Black, Dr. Berry's partner, testified he also received a letter from Strobach. Although his recollection of the letter was very hazy, he was certain it specifically referred to Usner and mentioned something negative about Usner being involved in a criminal case. He had not asked for any information about Usner and had no discussions with Strobach to precipitate a letter. He was not familiar with Usner at the time and threw the letter in the trash. Since then, he has gotten to know Usner and his qualifications and refers patients to him.
Usner testified he became extremely upset when Dr. Gaudin showed him Strobach's letter. He felt as if his future and his profession were "in real limbo." He testified he did not know who had received copies of the letter sent to Dr. Gaudin, so he took the letter to at least one hundred people over a several-month period to tell them the information in the letter was not *719 true. None of those people admitted seeing the letter before it was shown to them by Usner. However, Usner testified he felt he had salvaged his practice by going to professionals in the community and explaining his situation. Since his practice was so small when these incidents occurred, Usner dropped his claim for loss of income before trial. He stated, however, that it was not until a year after the incidents that he began to believe his practice was going to stabilize and grow. He testified he still gets upset about the incidents.

SELECTION OF TALES JURORS: MISTRIAL AND/OR CHALLENGE FOR CAUSE

(Assignment of error 1)
In this assignment of error, Usner asserts the following:
The Trial Court erroneously permitted five talesman jurors to be empaneled who should obviously have been struck for cause. Those five talesman jurors were selected in means that were wholly inappropriate from within the courthouse employment rosters. One of the five talesman jurors was the bailiff from the morning session! Others were witnesses with vast amounts of litigation related experience both before the Trial Judge and other divisions of the same district court. It was clear error for the Trial Court to refuse to strike these jurors for cause and begin anew a proper selection process.
Usner contends "[T]he inclusion of these improperly selected talesman jurors poisoned the panel, and deprived appellant of a fair trial."

Jury Selection Facts
The trial of this case began on October 9, 1989. Only eighteen persons appeared for jury duty. All eighteen were sworn and voir dire was conducted for all eighteen at the same time. Eight persons were selected for jury duty and the remaining members of the jury venire were excused. The court then recessed until 1:30 p.m.
When the court reconvened, one of the eight jurors selected was excused for cause. The trial judge them announced the following:
We have sent out now and picked up some talesmen jurors and I would like for those five persons to come up and hold up your right hand and be sworn and give us your name if you will please, all five of you.
The five tales jurors were Shannon Marie Stewart, Champ Yarborough, Donald Hammons, Jack Liuzza and Rosetta Harrell. They were sworn and voir dire of all five was commenced.
Stewart testified she did secretarial work in the Clerk of Court's office in the courthouse. She had no knowledge of the facts of the case, and did not know Strobach or his attorney.
Yarborough testified he lived in Kentwood and was a bailiff for the Tangipahoa Parish Sheriff's Office (SO). As a bailiff, he did work for all the judges. He was a retired State Trooper and testified in court about fifty times. He was present in the courtroom as bailiff for the morning session of court and heard the voir dire. He had no fixed opinions about the case.
Hammons testified he was a supervisor in the SO in the courthouse. He supervised road deputies, checked their reports and accepted charges of "people coming in off of the street". He testified hundreds of times in court, but it was mostly in criminal cases.
Liuzza testified he was a road deputy with the SO. He testified in court eight or ten times. They were all criminal cases. He did not know anything about the case.
Harrell testified she was a deputy clerk in the SO. She had been summoned for jury duty once before, but was not selected.
At this point in the proceedings, the five prospective jurors were retired from the courtroom. Counsel for Usner advised the court that he was "very much concerned" about the tales jurors because (1) "these five people were essentially grabbed out of the courthouse here", (2) "[T]hey have all worked in the Clerk's Office and the Sheriff's *720 Office", (3) "[S]ome of these people have testified umpteen times in court", (4) Yarborough was the "bailiff who led the jury in and out of the courtroom", (5) "any one of these five people might have so much knowledge of the system and its workings and have been in this courtroom so many times ... that whatever their opinions are is what the jury is going to do", and (6) "had I known this morning that I was going to be in this position I can promise you that I would not have used up my six strikes this morning on fourteen or eighteen ordinary people as opposed to saving it to strike these people." Pursuant to La.R.S. 13:3052, any objection to the manner of selecting a civil jury must be urged before entering on the trial of the case, or the objection is waived. Cf. La.C.C.P. art. 1635. Counsel for Usner then stated the following:
If we are therefore in a position where we are out of panel members, we don't have anybody else to choose from, I have no alternative but to move the Court for a mistrial at this point reserving my right to further voir dire these prospective jurors since I am not finished with them yet. I am doing this at this point in time trying to save the Court and the parties some time if that is possible. So for that reason I would move for a mistrial or alternatively that these prospective jurors be stricken at this point, and if necessary we come back tomorrow and start again.
(Emphasis added)
The trial judge stated that the jurors "were selected strictly in accordance with the law of this State, and I heard nothing whatever from any of the jurors or from counsel that would cause me to believe that they would be prejudiced in any way." He then denied the motion.
Voir dire was resumed. Hammons testified he knew of Strobach but did not know him personally. He knew the SO took patients to Strobach and that Strobach testified in criminal cases, but he never saw Strobach testify. He further testified he knew the District Attorney, Duncan Kemp, and Drs. William Black and Mark Berry, and said that he thought he could still remain objective.
The five tales jurors then gave the following descriptions of how they were summoned to appear:
Q How were you summoned to be here as prospective jurors? Let me ask each one of you that. Miss Stewart?
A They just come up to the Clerk's Office and asked if I would like to be a juror.
Q Who did?
A Janice Campo.
Q And does she work for the Judge?
A No, she doesn't. She works for Mr. Moore.
Q For the Clerk's Office?
A Yes.
Q How about you, Mr. Yarborough?
A The Judge.
Q The Judge personally asked you?
A He told me.
Q He told you?
A Of course I accepted.
Q And how about you, Mr. Hammons?
A Mr. Radar Career come told me he needed me.
Q I am sorry. Who is that, the bailiff who is here now?
A Yes.
Q And you, sir, Mr. Liuzza?
A I was asked by Career.
Q And ma'am?
ROSETTA HARRELL:
A They asked anyone in the office if they were available.
Finally, Hammons and Yarborough testified they had heard of the Copeland case. Hammons said he did not have anything to do with it. Yarborough said he did not remember any of the particulars of the case.
No objection was made about the qualifications of the tales jurors at this time. No challenge for cause was made at this time.
Three prospective jurors from the Division "C" jury venire were then called for the purpose of picking an alternate juror. The alternate was picked and she and the *721 five tales jurors were sworn in as trial jurors.

Right to Civil Jury Trial
There is no United States or Louisiana constitutional right to a trial by jury in a civil case in a Louisiana court; this right is provided for by statute. Scott v. Clark, 583 So.2d 938 (La.App. 1st Cir.1991). The statutory right to a trial by jury in a civil case in Louisiana is provided for in La.C.C.P. arts. 1731 through 1814. Although the right to a trial by jury in a civil case is statutory in Louisiana, the qualifications and exemptions of jurors are provided for in La. Const. of 1974, art. V, § 33 as follows:
(A) Qualifications. A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications.
(B) Exemptions. The supreme court shall provide by rule for exemption of jurors.
La.C.C.P. art. 1751 states that the qualifications and exemptions of jurors in civil cases are provided by special laws. Those special laws are La.R.S. 13:3041 through 3057 for parishes other than Orleans.

Qualifications of Jurors in Civil Cases
Pursuant to La. Const. of 1974, art. V, § 33(A), there are only three constitutional qualifications for jury service, and they are that the person be (1) a citizen of Louisiana, (2) 18 years of age, and (3) domiciled in the parish in which he or she is to serve. There is no constitutional prohibition against a police officer or a clerk of court serving on a civil jury. However, the legislature (not the judiciary) is given the power to provide for additional qualifications. The legislature has exercised this right in La.R.S. 13:3041 which provides that the qualifications of a juror in any civil case are those in La.C.Cr.P. art. 401. Article 401 provides as follows:
A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service.
(2) Be at least eighteen years of age.
(3) Be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
(4) Not be under interdiction or incapable of serving as a juror because of a mental or physical infirmity, provided that no person shall be deemed incompetent solely because of the loss of hearing in any degree.
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.
B. Notwithstanding any provision in Subsection A, a person may be challenged for cause on one or more of the following:
(1) A loss of hearing or the existence of any other incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party.
(2) When reasonable doubt exists as to the competency of the prospective juror to serve as provided for in Code of Criminal Procedure Art. 787.
La.C.Cr.P. art. 787 provides as follows:
The court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.
Police officers and clerks of court are not disqualified by statute from serving on a civil jury. There is no evidence in the record before us to show that any of the five tales jurors were unqualified for jury duty.

Exemptions of Jurors in Civil Cases
Pursuant to La. Const. of 1974, art. V, § 33(B), La.R.S. 13:3042 and La.C.Cr.P. art. 403, the Louisiana Supreme Court has provided for the exemptions of jurors in civil *722 (and criminal) cases in Rule XXV. Section 1 of Rule XXV provides, in pertinent part, that "all qualified citizens shall have the opportunity to be considered for jury service in the district courts of Louisiana and shall have an obligation to serve as jurors when summoned for that purpose, and that no citizen shall be excluded from jury service in the district courts of Louisiana on account of race, color, religion, sex, national origin or economic status." (Emphasis added). Sections 2 and 4[2] of Rule XXV provide for exemptions of jurors as follows:
Section 2. This court finds that the exemption of the following groups or occupational classes is in the public interest and, accordingly, members of such classes are exempt from jury service.
(a) Public officers in the executive, legislative, or judicial branches of the Government of the United States, or the State, or any subdivision thereof, who are actively engaged in the performance of official duties;

(b) Members in active service in the Armed Forces of the United States and members of the National Guard of this State while on active service;
(c) Members of paid fire or police departments of the State or any subdivision thereof and federal law enforcement officers;
(d) Members of the following groups when regularly and actively engaged in the practice of their professions: attorneys at law, ministers of religion, chiropractors, physicians, dentists, pharmacists and optometrists;
(e) All persons over seventy years of age.
. . . . .
Section 4. The jury commission shall not include in, and shall delete from, the general venire the names of those persons who have served as grand or petit jurors in criminal cases or as trial jurors in civil cases or in a central jury pool during a period of two years immediately preceding their selection for jury service; individual district courts may increase this two year period to a four year period by local rule of court. However, if the name of such a person is included in a general venire, that person may claim an exemption from jury service or may waive the exemption.
(Emphasis added)
It is implicit in the grants of exemptions to public officers (deputy clerks of court) and members of police departments (deputy sheriffs) that the Louisiana Supreme Court considers these persons are qualified to serve as jurors. If this were not so, there would be no necessity to grant exemptions to these persons. Finally, Section 3 of Rule XXV provides that "[A]ny person may waive his exemption from jury service, but the exemption is personal to him and is not a ground for challenge." (Emphasis added). The voir dire of the five tales jurors reflects that the question of exemptions was raised. None of the five tales jurors claimed an exemption.

Use of Tales Jurors
La.R.S. 13:3048 provides, in pertinent part, as follows:
All tales jurors shall possess the same qualifications as provided for regular jurors, but no publication of the tales jury list shall be necessary. ... Nothing herein contained shall be so construed as to limit the right of the judge in civil cases or by all parties litigant to a civil suit, or their counsel, after the list of regular jurors is exhausted, after the trial has commenced, to order the summoning of talesmen from among the bystanders or persons in proximity to the court house [sic], or from any portion of the parish, which the judge may designate.
As a statute, La.R.S. 13:3048 is subject to the standard rules of statutory construction. The following rules found in Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1st Cir.1984) are applicable:
When a law or ordinance is clear and free from all ambiguity, it must be given effect as written....

*723 When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the law maker....
When the expressions of a law are "dubious", the most effectual way of discovering the true meaning of the law is to consider the reason and spirit of it, or the cause which induced the lawmaker to enact it.... When a law is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred over one which renders part thereof ridiculous or nugatory.... If there is an irreconcilable conflict between the provisions of a law, only one provision can prevail.
(Emphasis added; citations omitted)
See also La.R.S. 1:1 et seq.; La.C.C. art. 9 et seq.; Achee v. Louisiana State Employees' Retirement Board, 527 So.2d 1116, 1118-1119 (La.App. 1st Cir.1988); Notoriano v. Anthony, 527 So.2d 1120, 1121-1122 (La.App. 1st Cir.1988).
Tales jurors must have the same qualifications as regular jurors. Thus, deputy sheriffs and deputy clerks of court are qualified to be tales jurors in civil jury cases. The judge in a civil jury trial has the right "after the list of regular jurors is exhausted ... to order the summoning of talesmen from among the bystanders or persons in proximity to the court house [sic], or from any portion of the parish, which the judge may designate." In State v. Mims, 505 So.2d 747 (La.App. 2nd Cir. 1987), it was held that no error occurred when tales jurors were chosen at random from persons in the hallways of the courthouse pursuant to La.C.Cr.P. art. 785, the criminal procedure equivalent of La.R.S. 13:3048. In State v. Monk, 315 So.2d 727, 737-738 (La.1975), the court observed that "[P]ermitting the selection of tales jurors from among bystanders in or about the courthouse is not violative of the right to an impartial jury."
In the instant case, the trial judge ordered the summoning of qualified persons (deputy sheriffs, a deputy clerk and an employee of the Clerk of Court's Office) from among the persons in or about the courthouse to be tales jurors pursuant to La.R.S. 13:3048. La.R.S. 13:3048 does not prohibit the use of deputy sheriffs and deputy clerks of court (or any other persons who work in the courthouse) from serving as tales jurors. The evidence in the record does not show a violation of La.R.S. 13:3048.

Challenges for Cause for Tales Jurors in a Civil Jury Trial
The authorized challenges for cause in a civil jury trial are listed in La.C.C.P. art. 1765[3] as follows:
A juror may be challenged for cause based upon any of the following:

*724 (1) When the juror lacks a qualification required by law;
(2) When the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial;
(3) When the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict;
(4) When the juror served on a previous jury, which tried to the same case or one arising out of the same facts;
(5) When the juror refuses to answer a question on the voir dire examination on the ground that his answer might tend to incriminate him.
It is questionable whether Usner challenged any of the tales jurors for cause. The transcript shows he moved for a mistrial and, in the alternative, moved "that these prospective jurors be stricken". He did not attempt to specifically relate any of the grounds for challenge for cause with any particular tales juror. However, we will assume for purposes of this assignment of error that Usner's objection was, in part, a challenge for cause against the police officers.[4] There is no evidence in the record of any other possible ground for a challenge for cause.
The first question is whether a deputy sheriff, because of his status as a police officer, would be biased against Usner, as provided for in La.C.C.P. art. 1765(2). We have found no jurisprudence on this issue applicable to civil jury trials. The law applicable to this issue in criminal jury trials is set forth in State v. Comeaux, 514 So.2d 84, 95 (La.1987) as follows:
Service on a criminal jury by one associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause; however, such association does not automatically disqualify a prospective juror. ... A juror's relationship to one associated with law enforcement only disqualifies him if the relationship is "such that one might reasonably conclude that it would influence the juror in arriving at the verdict." ... The trial judge is vested with wide discretion in appraising the impartiality of prospective jurors, and his ruling will not be disturbed on appeal absent a clear showing of abuse of that discretion.
(Citations omitted)
Thus, it was held in State v. Simmons, 390 So.2d 1317 (La.1980) that an actively employed criminal deputy sheriff is not a competent criminal juror. See, also State v. Vanderpool, 493 So.2d 574 (La. 1986). In the instant case, based on the evidence of record, there is no reason to conclude that the law enforcement duties performed by the deputy sheriffs would adversely affect their abilities to be impartial toward Usner. The trial judge did not abuse his discretion in refusing to strike them for this reason. Cf. Dawson v. Mazda Motors of America, Inc., 517 So.2d 283 (La.App. 1st Cir.1987); Seals v. Pittman, 499 So.2d 114 (La.App. 1st Cir.), writ denied, 503 So.2d 15, 1021 (La.1987). Hammons testified he could be objective; Yarborough testified he had no fixed opinion about the case. The trial judge's statement when he denied Usner's motion shows he accepted this testimony as true.
Secondly, Usner asserts "witnesses with vast amounts of litigation related experience" are subject to a valid challenge for cause. However, he cites nothing in La.C.C.P. art. 1765 or the jurisprudence to support this assertion. This claim is without merit.
Finally, Usner asserts Yarborough's status as "bailiff from the morning session" supports a challenge for cause. Again, he cites nothing in Article 1765 or the jurisprudence to support this claim. As previously indicated, Yarborough's status as a police officer does not disqualify him from jury duty. The fact that he was *725 present in the courtroom for the voir dire of the eighteen members of the regular venire is not a ground for challenge for cause. If it were, the seven jurors ultimately seated would be disqualified because they were also present. Yarborough testified he had no fixed opinion about the case. This testimony showed he was impartial.

Mistrial
The law applicable to mistrials in civil jury trials is set forth in Barnes v. Thames, 578 So.2d 1155, 1161 (La.App. 1st Cir.), writ denied, 577 So.2d 1009 (La.1991) as follows:
The Louisiana Code of Civil Procedure does not expressly provide for mistrials, and the jurisprudence concerning motions for mistrial in civil cases is limited. Generally, mistrials are properly granted because of some fundamental failure in the proceeding. ... Generally, a motion for mistrial in a civil case should be granted under the following circumstances: (1) when, before the trial ends and the judgment is rendered, the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity; and (2) where no other remedy would provide relief to the moving party....
Motions for mistrial should also be granted upon proof of prejudicial misconduct occurring during a jury trial, which cannot be cured by admonition or instruction.... Because a mistrial results in the discharge of one jury and the impaneling of another to try the case anew, it is a drastic remedy.... The trial judge is vested with broad discretion to grant a motion for mistrial where no other remedy would afford relief or where circumstances indicate that justice may not be done if the trial continues.... This court should not disturb the trial court's determination unless there was an abuse of discretion.
(Citations omitted)
A prerequisite for a successful motion for a mistrial in a civil case is that "the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity". (Emphasis added). In the instant case, the tales jurors were properly qualified, La.R.S. 13:3048 was followed and there was no valid challenge for cause. Usner failed to show a legal basis for a mistrial. When he denied the mistrial motion, the trial judge observed that "I heard nothing whatever from any of the jurors ... that would cause me to believe that they [the tales jurors] would be prejudiced in any way." This factual observation by the trial judge was not clearly wrong. His decision was not an abuse of discretion.
This assignment of error is without merit.

LIABILITY OF STROBACH FOR DEFAMATION

(Assignment of error 2)
Usner asserts "the jury verdict was clearly erroneous in failing to find that defamation had occurred." Usner contends the letters to Dr. Gaudin and Duncan Kemp, and the telephone call to Dr. Berry "were unquestionably false and were unquestionably made with malice."
Freedom of speech or expression is guaranteed in the First Amendment of the United States Constitution and La. Const. of 1974, art. I, § 7. The Louisiana constitutional provision states that "[E]very person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." What constitutes an abuse of the right of freedom of speech is, in part, controlled by La.C.C. art. 2315 and the law of tort on defamation (libel and slander). See the excellent discussion of defamation in F. Maraist, Vol. II, Louisiana Practice Series, Louisiana Torts Law: Cases and Materials, pp. 609-628 (1991).
The elements of the tort of defamation are (1) defamatory words; (2) publication; (3) falsity; (4) malice; and (5) resulting injury. Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La.1980). In Redmond v. McCool, 582 *726 So.2d 262, 264-265 (La.App. 1st Cir.1991), appears the following:
Privilege is a defense to a defamation action.... A qualified privilege exists when defamatory statements are made: "(1) in good faith, (2) on a matter in which the person making the communication has an interest or with regard to which he has a duty, or (3) to a person with a corresponding interest or duty."... Good faith exists for the purpose of this privilege when the communicating party has reasonable grounds to believe the statement to be true.
. . . . .
Only when a statement is found to be made without reasonable grounds for believing it to be true can the person uttering the statement be found to be actuated by malice or ill will....
(Citations omitted)
Strobach gave the following testimony concerning why he thought Usner was the social worker in the Copeland case:
Q How did it come about that you had an association with Mr. Usner's name with the Copeland trial?
A I will try not to bore you with this. We go back in time, this Copeland murder business was a very sordid, ugly thing. I was named by the defense to examine this man privately as a mechanism to technically keep me out of the trial so when the trial came up the District Attorney's Office called me and said we have a problem. We have got a social worker coming up here who is going to testify that this murderer was insane at the time. What is a social worker? What is a psychologist? Can you help us out? So I helped them out defining what a psychiatrist is, what a psychologist is, and what a social worker is, and answered their various questions that they needed to prepare. That was the most I could possibly do for the District Attorney's Office. And then the trial took place. The man was subsequently convicted, but there was a lot of controversy about that trial how it was handled. There was a dinner meeting at Ron Macaluso's house sometime after that.
Q Ron Macaluso is an attorney in Hammond?
A Ron Macaluso is an attorney. He was the attorney that had been appointed to defend Mr. Copeland. And at that dinner meeting they were talking about the trial and talking about how the social worker had been treated by the District Attorney's Office. And I heard Mr. Macaluso mention Gene Usner's name. Since he was the defense attorney, since he had obtained the social worker to help with the plea of insanity, I thought this was his expert. My wife was with me and she heard the same thing. So I thought that was the expert at the trial. Subsequent to that at the Mental Health Clinic it came up in discussion that Mr. Usner was involved in a custody case as well as people at the Mental Health Clinic and that they didn't think that he would testify at the custody case because he had once had a very bad experience in court. And I thought, oh, I know the bad experience he had in court. So it wasn't something I just came up with at the top of my head out of malice or something mean to do to Mr. Usner. This was an understanding I thought I had, mistaken, but that is how I came to believe that.
Q Dr. Strobach, Duncan Kemp testified earlier that he was confused. Is it your testimony that you likewise were confused as to whether it was Mr. Usner or a name similar to his?
A I thought it was Mr. Usner until the day I got the second letter from Duncan, and the day I got that letter I turned white and went, I have made a mistake.
Q What did you do then?
A The day I got that letter I called you on the phone, and I said, Curtis, I have made a mistake. What do I need to do? And you suggested I call Mr. Usner.
Q Did you call Gene Usner?
A I called Gene Usner up on the phone.

*727 Q And what was the extent of your conversation?
A I told him that I had made a mistake. I told him that I wanted to explain how this whole thing had happened. Would he meet me for lunch at Brady's, we made a date. He called me back ten minutes later and said, no, he couldn't meet me for lunch, he had to talk with his lawyer first, and the next I heard of him was when I was served that suit for a million dollars.
. . . . .
Q Doctor, as I understand your testimony the reason that you thought my client Mr. Usner was the same person who testified in the Copeland trial was from two things, the conversation over dinner at Mr. Macaluso's house and some comments later on about Mr. Usner having had a terrible time when he testified in court on some previous case, right?
A Yes, sir.
Q Now in the dinner at Mr. Macaluso's house, am I not correct that Mr. Macaluso referred to Mr. Usner as someone he considered a very competent expert?
A Correct.
Q And is it your testimony that he specifically that day at any point during that conversation referred to Mr. Usner as having testified in the Copeland trial?
A That was my impression.
Q And again who was the person that indicated to you that Mr. Usner had a terrible time in some previous testimony?
A Mr. Mike Michalik.
The jury apparently believed this testimony and accepted it. This testimony shows that (1) Strobach had a reasonable basis to believe that Usner was the social worker in the Copeland case and (2) Strobach was in good faith.
Strobach's opinions concerning Usner and his abilities do not constitute defamation. Mashburn v. Collin, 355 So.2d 879 (La.1977) and the authorities cited therein.
After reviewing all of the evidence of record, we conclude that the jury's factual findings are not clearly wrong.
This assignment of error is without merit.

STROBACH'S COVERAGE UNDER THE LMMIC POLICY
LMMIC appeals the judgment of the trial court for Strobach on the third party demand. The trial court found that LMMIC provided liability coverage for Strobach and owed him a defense because the suit arose from a "medical incident" resulting from Strobach's medical practice.
LMMIC issued a physicians' and surgeons' professional liability insurance policy to Strobach. The policy provided individual professional liability coverage for "[A]ll sums which the insured shall become legally obligated to pay as damages because of injury, to which this insurance applies, caused by a medical incident which occurs during the policy period in the practice of the insured's profession as a physician or surgeon...." "Medical incident" is defined as "any act or omission in the furnishing of professional medical services to any person...."
The policy further provides LMMIC has the "right and duty to defend any suit against the insured seeking damages because of such injury even if any of the allegations of the suit are groundless, false or fraudulent."
The rules for interpreting a contract are found in La.C.C. art. 2045 et seq. Although a contract of insurance must provide the minimum amount of coverage required by statute, the parties may contract for additional coverage, if such coverage is not against good public policy. A contractual provision is null if it violates a rule of public order. La.C.C. art. 2030. The general rules of interpreting contracts of insurance have been set forth in Pareti v. Sentry Indemnity Company, 536 So.2d 417, 420 (La.1988), as follows:
There are certain elementary legal principles which apply to the interpretation *728 of insurance policies. An insurance policy is a contract and, as with all other contracts, it constitutes the law between the parties.... If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written....
An insurance contract is to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another.... If there is an ambiguity in a policy, then that ambiguity should be construed in favor of the insured and against the insurer.... However, courts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language. [Citations omitted.]
Further, courts should not strain to find an ambiguity where none exists. Cell-O-Mar, Inc. v. Gros, 479 So.2d 386 (La.App. 1st Cir.1985), writs denied, 481 So.2d 1332, 1333 (La.1986). Whether a contract is ambiguous or not is a question of law. Borden, Inc. v. Gulf State Utilities Company, 543 So.2d 924 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989); Aycock v. Allied Enterprises, Inc., 517 So.2d 303 (La. App. 1st Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988). See also Watts v. Aetna Casualty and Surety Company, 574 So.2d 364 (La.App. 1st Cir.), writ denied, 568 So.2d 1089 (La.1990).
The extent of an insurer's duty to defend was set forth by the Louisiana Supreme Court in American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253, 259 (1969) as follows:
Generally the insurer's obligation to defend suits against its insured is broader than its liability for damage claims. And the insurer's duty to defend suits brought against its insured is determined by the allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage.
Thus, if, assuming all the allegations of the petition to be true, there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit. Additionally, the allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured.
(Citations omitted)
Usner's petition alleges Strobach "intentionally, maliciously, wantonly, and recklessly defamed, libelled and slandered [Usner], as well as tortiously interfered with his business...." None of the particular acts set forth in the petition have any relationship whatsoever to a "medical incident," i.e., an act or omission in the furnishing of professional services to any person by Strobach. Since the allegations of the petition unambiguously exclude coverage under LMMIC's policy, LMMIC had no duty to defend.
Strobach contends he was rendering professional services to the community as a whole by warning the community about a "paraprofessional" whom he thought was incompetent. This court set forth the commonly understood meaning of "professional services" in Aker v. Sabatier, 200 So.2d 94 (La.App. 1st Cir.), writs denied, 251 La. 48, 49, 202 So.2d 657, 658 (1967): "Professional services, in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due."[5]Aker, 200 So.2d at 97. Strobach's conduct at issue herein did not arise in the course of the rendering of professional services by him to a patient. There was no coverage under the LMMIC policy.
*729 Because LMMIC had neither coverage nor a duty to defend, the trial court committed legal error in rendering judgment on the third party demand in favor of Strobach.
This assignment of error has merit.

DECREE
For the foregoing reasons, the judgment of the trial court that dismissed Usner's petition is affirmed, the judgment in favor of Strobach against LMMIC on the third party demand is reversed, and judgment is rendered in favor of LMMIC and against Strobach dismissing the third party demand with prejudice. Usner is cast for all costs arising from the main demand; Strobach is cast for all costs arising from the third party demand.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
SHORTESS, J., dissents in part and will assign reasons but concurs in that part of the opinion which reverses the judgment against LMMIC.
SHORTESS, Judge, dissenting in part.
In my opinion, serious error occurred in the selection of this jury. The plaintiff had exhausted his peremptory challenges before the lunch break. During lunch, the trial judge unilaterally summoned from the courthouse environs (1) Jack Liuzza, a deputy sheriff who had testified in eight to ten other suits; (2) Shannon Stewart, an employee of the clerk of court; (3) Rosetta Harrell, a deputy clerk employed by the sheriff; (4) Donald Hammons, a supervisor from the sheriff's department who had testified hundreds of times previously; and (5) Champ Yarborough, the bailiff who had served during the morning session of the trial, who had led the other jurors in and out of the courtroom, and who had testified in approximately fifty cases while employed as a state trooper. The trial court was aware plaintiff had no peremptory challenges remaining and thus these five talesmen would complete the jury unless successfully challenged for cause.
At this point plaintiff's counsel moved for a mistrial. In the alternative, he moved to strike all five talesmen for cause. Plaintiff's counsel contended these five jurors might exert undue influence on the other jurors because of their vast courtroom experience. He expressed concern that his client would not get a fair trial because the seven "ordinary" jurors would be overwhelmed by the authority of the "courthouse" jurors. The trial court, however, overruled plaintiff's motion, stating: "I have heard nothing from any of the jurors which would lead me to believe that they would be prejudiced either way."
The court then allowed counsel to continue the voir dire of the talesmen. The voir dire revealed that the talesmen were not summoned by the sheriff. Instead, an employee of the clerk of court, the bailiff who replaced Champ Yarborough in the courtroom, and the trial judge himself selected these tales jurors.[1] When voir dire was completed, the five talesmen were sworn and seated as jurors along with one alternate juror.[2] Deputy Donald Hammons was selected by the jury as its foreman.
The Louisiana Supreme Court noted long ago that it is sometimes necessary for the speedy and proper administration of justice that the court resort to talesman jurors. State v. Ferray, 22 La.Ann. 423, 424, 31 La. 313, 314 (1870). Tales jurors are permitted *730 in civil trials pursuant to LSA-R.S. 13:3048. That statute provides for the selection by the jury commissioner of 100 tales jurors, whose names shall be kept by the clerk of court in a sealed box until the court, in its discretion, orders the clerk to draw tales jurors to be summoned by the sheriff when it appears the regular venire will be exhausted. The statute also provides:
Nothing herein contained shall be so construed as to limit the right of the judge in civil cases or by all parties litigant to a civil suit, or their counsel, after the list of regular jurors is exhausted, after the trial has commenced, to order the summoning of talesmen from among the bystanders or persons in proximity to the [courthouse], or from any portion of the parish, which the judge may designate. (Emphasis added.)
The determinative issue in this case is whether employees of the court and the sheriff are "bystanders or persons in proximity to the [courthouse]" within the contemplation of R.S. 13:3048. Civil cases involving tales jurors are rare, and there is no Louisiana jurisprudence involving tales jurors conscripted from courthouse personnel.
Black's Law Dictionary defines "bystander" as "a chance looker-on ... one who has no concern with the business being transacted; one present but not taking part...." Black's Law Dictionary 182 (5th ed. 1979). Employees of the court or the sheriff are not at the courthouse by chance. Furthermore, many employees of the sheriff and of the court are involved in the handling of civil cases on a daily basis.
The common meaning of the phrase "in proximity to" is near or close. It implies that there is some distance, however small, between two objects. Employees of the court or of the sheriff who work in the courthouse are not close to the courthouse.
It was, in my opinion, not the intent of the legislature in providing for the summoning of civil tales jurors that they be summoned from among courthouse personnel.[3] The potential for the exercise of undue influence, even unintentionally, is present under such circumstances simply by virtue of the positions held by such jurors.[4]
After reviewing the answers given by the talesmen during voir dire, it appears none was subject to challenge for cause based on the reasons enumerated in Louisiana Code of Civil Procedure article 1765. There are no reported Louisiana cases involving motions for mistrial with similar facts. This case does not fit into any of the categories of cases for which civil mistrials are typically sought.[5] In my opinion, however, the trial court should have granted plaintiff's motion for mistrial.
Civil mistrial is a jurisprudentially-created creature for which there is no statutory or codal authority. Spencer v. Children's Hospital, 432 So.2d 823, 825 (La. 1983); Galloway v. Baton Rouge General Hospital, 583 So.2d 1169, 1178 (La.App. 1st Cir.1991, Shortess, J. dissenting). Louisiana courts have general equitable powers under Louisiana Civil Code article 21 and Louisiana Code of Civil Procedure article 191 to provide procedural devices where none exist under positive law. Spencer, 432 So.2d at 825-826.
*731 Mistrials are generally granted because of some fundamental failure in the proceeding. Barnes v. Thames, 578 So.2d 1155, 1161 (La.App. 1st Cir.1991); Searle v. Travelers Insurance Co., 557 So.2d 321, 323 (La.App. 4th Cir.1990). Although the Fourth Circuit Court of Appeal has noted that "it is extremely difficult to formulate rules as to what specific circumstances should result in a mistrial,"[6] two broad rules have developed regarding the granting of motions for mistrial.
The first rule is that such motions should be granted when the trial judge determines during the trial that it is impossible to reach a proper judgment because of some error or irregularity and the moving party has no other avenue of relief. Barnes v. Thames, 578 So.2d at 1161. In this case, the error or irregularity making it impossible to reach a proper judgment, i.e., the empaneling of improper tales jurors, was committed by the trial court. This was not the normal case of error or irregularity during the trial. Obviously, the trial court would not, and did not, recognize the error during the trial. Plaintiff had no avenue of relief other than a motion for mistrial. Although he could have moved for a new trial under Code of Civil Procedure article 1972(3) or 1973, he would have been unable to adduce any evidence at the hearing from the jurors regarding whether they were influenced by the "courthouse jurors." Louisiana Code of Evidence article 606(B).[7]
The second rule is that motions for mistrial should be granted when the mover proves prejudicial misconduct occurring during a jury trial which cannot be cured by admonition or instructions. Barnes v. Thames, 578 So.2d at 1161. Prejudicial misconduct occurring during a jury trial is usually the result of some comment or conduct by the judge, one of the attorneys, or a witness which fatally taints the proceedings. Although plaintiff may be unable to prove prejudice, I feel he was denied a fair trial, especially since all his peremptory challenges had been exercised before the trial court enlisted the talesman. In my opinion, the failure of the trial court to grant the motion for mistrial was reversible error.
I also dissent from the majority's finding that no defamation took place. There are only two defenses to defamationtruth and privilege.[8] Truth is an absolute defense to an action for defamation. Pool v. Gaudin, 209 La. 218, 24 So.2d 383 (1945). However, the statements made by defendant regarding plaintiff's involvement in the Copeland trial are indisputably false, and defendant presented no evidence to support his allegations of incompetence against plaintiff.
Privileges may be either absolute or qualified. No facts are present in this case which give rise to an absolute privilege. Even though false, defendant's statements may be protected by a qualified privilege. Martinez v. Soignier, 570 So.2d 23 (La. App. 3d Cir.1990), writ denied, 572 So.2d 94 (1991). However, the statements are entitled to a qualified privilege only if they meet the following criteria:
1. Made in good faith;

*732 2. Regarding a subject matter to which the person communicating has an interest or in reference to which he has a duty, i.e., there is an interest to be upheld;
3. Limited in scope to the interest to be upheld;
4. Made on the proper occasion;
5. Published in a proper manner; and
6. Published to proper parties only.
Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958); Elmer v. Coplin, 485 So.2d 171, 176 (La.App. 2d Cir.), writ denied, 489 So.2d 246 (1986).
Good faith is a primary requisite of a qualified privilege. Baudoin v. Louisiana Power & Light Co., 540 So.2d 1283 (La. App. 5th Cir.), writ denied, 542 So.2d 1383 (1989). The jurisprudence has set forth a two-pronged test of good faith: the person making the statement must both have reasonable grounds for believing the statement is true and he must honestly believe it is a correct statement. Vinas v. The Merchants' Mutual Insurance Co., 33 La. Ann. 1265, 1267 (1881); Miller-Douglas v. Keller, 579 So.2d 491 (La.App. 4th Cir. 1991); Jones v. Wesley, 424 So.2d 1109, 1111 (La.App. 1st Cir.1982). The reasonable grounds for belief must be supported by circumstances sufficiently strong to warrant a cautious person in the belief the allegations he is making are true. Sibley v. Lay, 11 So. 581, 44 La.Ann. 936 (1892); Decoux v. Lieux, 33 La.Ann. 392 (1881).
The information conveyed in the communication must be given in the performance of a legal, moral, or social duty to a person with a corresponding interest or duty. Walsh v. Bertel, 187 La. 877, 175 So. 605, 609 (1937); Toomer v. Breaux, 146 So.2d 723 (La.App. 3d Cir.1962).[9] The publication must be made only to those persons with a corresponding duty. The qualified privilege extends to the reasonably necessary use of clerical personnel in the transmission of the privileged communications, as well as to the incidental publication thereof to employees or associates of either the sender or the receiver, providing such incidental publication is in the usual course of business and is reasonably necessary to effect the communication of the privileged matter to those entitled to receive it. Elmer v. Coplin, 485 So.2d at 179; Commercial Union Insurance Co. v. Melikyan, 424 So.2d 1114 (La.App. 1st Cir.1982). However, the one publishing the communication must make an effort to ensure the information will be kept confidential. Davis v. Southern Savings Association, 557 So.2d 1011, 1015 (La.App. 4th Cir.1990); Newton v. State, 536 So.2d 565, 568 (La. App. 1st Cir.1988), writ denied, 541 So.2d 901 (1989).
The protection of the qualified privilege may be lost by the manner of its exercise. The communication must not go beyond what the occasion demands, nor may it be unnecessarily defamatory. Madison v. Bolton, 102 So.2d at 443-444; Roy & Roy v. Riddle, 187 So.2d 492, 494 (La.App. 3d Cir.), writ denied, 249 La. 724 (1966), 190 So.2d 236.
Defendant testified he was not acting out of malice but honestly believed plaintiff was the Copeland expert when he made the communications at issue in this suit. His communications were privileged, however, only if he also had reasonable grounds to believe the allegations were true. As the supreme court noted in Decoux v. Lieux, persons who make statements without reasonable grounds for belief are not protected from responsibility by the "uncharitable idiosyncrasies of individuals which enable them recklessly to give credence to base suspicions of their neighbor without inquiry." 33 La.Ann. at 397.
*733 Defendant admitted he made no inquiry whatsoever into the truth of his allegations that plaintiff was the Copeland expert. His information was based on gossip and hearsay which he made no effort to verify. He made statements regarding plaintiff's qualifications, although all he knew about plaintiff's credentials was that he was experienced in treating substance abusers. He thus failed to meet the test of good faith required to be entitled to a qualified privilege.
Defendant argues that he had a duty to communicate his concern about plaintiff's qualifications to treat very sick patients to physicians and other professionals in the community who made referrals of such patients. However, he made little effort to ensure the information was kept confidential. He testified he typed "personal and confidential" on the envelope addressed to Dr. Gaudin but did not do so on the letter to Duncan Kemp. The last paragraph of the letter to Dr. Gaudin, in which he directs Dr. Gaudin to "share this referral information with your colleagues, in particular the Chiefs of Staff and other doctors who might be referring to Mr. Usner, as well as the physicians in charge of emergency room call," belies any intent to keep the contents of the letter confidential.
Furthermore, the communications went far beyond what the occasion demanded. If defendant's purpose was to make persons referring patients to plaintiff aware that he might not be qualified to handle very sick patients, he could have done so in a less offensive manner.
In my opinion, plaintiff proved he was defamed by defendant, and defendant failed to prove an affirmative defense. Plaintiff is entitled to be awarded damages for the mental anguish he suffered as a result of the defamation.
I respectfully dissent in part.
NOTES
[1] According to Strobach, the Mrs. Y incident was either a week before or a week after the Mrs. X incident.
[2] Section 4 of Rule XXV also provides for the exclusion of jurors from the general venire.
[3] The challenges for cause in a criminal jury trial are set forth in La.C.Cr.P. art. 797.
[4] A prospective juror's status as a deputy clerk of court is not a valid ground for a challenge for cause. State v. Williams, 458 So.2d 1315 (La. App. 1st Cir.1984), writ denied, 463 So.2d 1317 (La.1985).
[5] The court in Aker found that ambiguity in the policy was created by a brochure purportedly issued by the insurer stating the policy covered claims for libel and slander. There was no such brochure to create an ambiguity in this case.
[1] During voir dire, Champ Yarborough testified as follows:

Q. How were you summoned to be here as prospective jurors?
* * * * * *
Q. How about you, Mr. Yarborough?
A. The Judge.
Q. The Judge personally asked you?
A. He told me.
Q. He told you?
A. Of course I accepted.
[2] The alternate was selected from a group of three who came from Division C's panel of prospective jurors. (This case was tried in Division E.) The transcript is silent as to how the court was able to summon these persons to select the alternates but was unable to get them earlier and before he had seated the talesmen. One of the Division C veniremen was excused because she knew the plaintiff, one was peremptorily challenged by the defendant, and the remaining venireman was chosen as the alternate juror.
[3] Tales jurors such as the ones selected in this case would be subject to challenge for cause in a criminal case. State v. Vanderpool, 493 So.2d 574 (La.1986); La.C.Cr.P. art. 797.
[4] I note there was an additional problem with the jury which may have contributed to the influence of the "courthouse" jurors. Two of the "ordinary" jurors testified on voir dire that their hearing was impaired. The judge noted after the plaintiff rested: "[I]t has been reported by the jury that they can't hear half of what is going on...."
[5] Those typical categories include a jury which is unable to reach a decision, as well as those cases in which the moving party believes he has been prejudiced because of some action or comment by the trial judge, by a party, by a party's attorney, or by a juror; or by unfair allotment of peremptory challenges. See Spencer v. Children's Hospital, 432 So.2d 823, 825 nn. 1-6 (La. 1983), for an extensive list of citations of cases in each of these categories.
[6] Searle v. Travelers Insurance Co., 557 So.2d 321, 323 (La.App. 4th Cir.1990).
[7] LSA-C.E. 606(B) forbids a juror from testifying as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict, other than to testify as to whether any outside influence was improperly brought to bear upon him. There are no allegations in this case that the courthouse jurors deliberately attempted to influence the ordinary jurors. The danger of the courthouse talesmen is not their overt influence on the jurors but the subtle effect of their superior knowledge of things legal.
[8] Stress is not a defense to defamation. Defendant presented evidence that his job was very stressful because the clinic was understaffed and underfunded, one of the other psychiatrists at the clinic was sick and later died, and the clinic treated many patients who were very sick. Defendant testified his personal life was stressful also; his wife was about to go into labor, his father-in-law was having an angiogram following heart bypass surgery, and his attorney was out of town. These factors may have contributed to defendant's lack of good judgment in making the defamatory statements, but they give him no legal justification for doing so.
[9] See, for example, E.B. Ludwig Steel Corp v. C.J. Waddell Contractors, 534 So.2d 1364 (La. App. 5th Cir.1988), writ denied, 536 So.2d 1239 (1989) (owner had duty to report faulty construction to contractor's bonding company); Jones v. Wesley, 424 So.2d 1109 (La.App. 1st Cir.1982) (executive director of governmental agency had duty to report possible mileage padding by employee to district attorney); Elmer v. Coplin, 485 So.2d 171 (La.App. 2d Cir.), writ denied, 489 So.2d 246 (1986) (attorney has duty under Code of Professional Responsibility to report to National Conference of Bar Examiners information he thought might bear on qualifications of applicant for admission to bar).